**In re Richard G. DRAYMAN, Debtor.**

**Josephine S. HANSEN, Leah E. Millias, and Doris M. Gibson, Plaintiffs,**

**v.**

**Richard G. DRAYMAN, Defendant.**

**Bankruptcy No. LA86–02244–JB. Adv. No. 86–1432–JB.**

United States Bankruptcy Court, C.D. California.

Sept. 3, 1987.

Irving Gellert, First American Law Centers, Van Nuys, Cal., for plaintiffs.

Alan Rosen, Rosen, Loeb & Fields, Sherman Oaks, Cal., for debtor.

## DECISION DETERMINING DEBTS TO BE DISCHARGEABLE, AND ORDER

ARTHUR N. VOTOLATO, Jr.,[*] Bankruptcy Judge.

Heard on May 22, 1987, on complaints filed by Josephine S. Hansen, Leah E. Millias, and Doris M. Gibson, who seek a determination of nondischargeability of debts allegedly owed to them by the debtor, Richard Drayman, pursuant to 11 U.S.C. § 523(a)(2)(A).[1] The three complaints had been ordered consolidated previously, and so we heard them together.

The pertinent facts are as follows:[2] Drayman was a real estate developer, whose practice was to obtain land (or options to purchase land), and then to construct housing thereon, on speculation,[3] for sale, hopefully at a profit. In order to finance the development and construction, he formed limited partnerships for each project. The partnerships usually ran for twelve or eighteen months, and Drayman was the general partner for each. His standard partnership agreement specified the capital contribution of each limited partner and also the amount of profit each limited partner would receive when, and if, the property were sold. Partnerships with a one-year term provided for a fifty percent return (e.g., a $10,000 investment yielded a $15,000 return if the projected sales price were obtained); an eighteen month investment was to yield a seventy-five percent return. The limited partners' investments were secured by a deed of trust on each separate property, in the face amount of the investment plus the agreed return. Only encumbrances existing at the time of execution of the partnership agreements, and disclosed therein, were senior to the trust deeds in favor of the limited partners.

Each of the named plaintiffs invested in at least one of the partnerships in which Drayman was the general partner. Leah Millias and Doris Gibson invested $10,000 and $12,724, respectively, in the partnership known as Ocean Drive # 3, Ltd.; Millias also invested $10,000 in Oceanaire # 2, Ltd. Moreover, Millias and Gibson each put $10,000 into Wooley Road, Ltd. *See* Joint Pretrial Order. When the partnership documents were executed, the title to Wooley Road was in escrow. Drayman testified that subsequently, the owner of the Wooley Road property refused to convey, and that after giving all the limited partners an opportunity to withdraw, (none did), and with the consent of Millias and Gibson, he switched their investments from Wooley Road, Ltd. to Ocean Drive # 4, Ltd. Josephine Hansen also invested $10,000 in Ocean Drive # 4, Ltd. on March 6, 1981. Thereafter, for various reasons (but *not* including misappropriation or misapplication of funds), all of the properties mentioned above were eventually foreclosed, and the plaintiffs, along with many other Drayman investors, lost their entire contribution. In the process, Mr. Drayman lost his reputation as someone with whom to do business.

Historywise, and long prior to any of the above partnership agreements, the plaintiffs had known each other from their em-

---

[*] Of the District of Rhode Island, Sitting by Designation.

**1. § 523. Exceptions to discharge**
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
....
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

**2.** This opinion constitutes our findings of fact and conclusions of law. *See* Bankruptcy Rule 7052 and Fed.R.Civ.P. 52.

**3.** We understand "on speculation" to mean construction commenced on the expectation that the product (housing) would be sold upon completion, and for which no contract for sale exists when the project is undertaken.

ployment with Pacific Telephone, and testified that they heard of Drayman through one Lee Evangelista, an acquaintance of the plaintiff, Leah Millias. Mrs. Evangelista had been a limited partner in one of Drayman's earlier projects, had allegedly realized a fifty percent return when that project was sold, and told Ms. Millias of her good fortune, while suggesting limited partnerships with Drayman as a good investment. Millias and Gibson took that advice, sought out Drayman, and when the next limited partnerships were being formed in February 1981, invested in Ocean Drive #3, Oceanaire #2, and Wooley Road. Ms. Hansen was unable to get into those partnerships, but went to a later meeting with Drayman concerning Ocean Drive #4. Apparently impressed by the things she had already heard from Mrs. Evangelista and/or her friends, Ms. Hansen brought a cashier's check payable to herself or Drayman, and invested $10,000 in Ocean Drive #4 on March 6, 1981, the day she met Drayman for the first time.

Each of the plaintiffs testified that during his sales pitch, Drayman "guaranteed" that their investments were safe, that they stood no chance of losing their money, and that but for this "guarantee" they would not have invested their money with him. Drayman testified that he gave no such "guarantee." The partnership agreements signed by the plaintiffs do not contain a guarantee. After the various partnership properties were foreclosed, the plaintiffs sued Drayman in Ventura County Superior Court alleging inter alia, fraud, misrepresentation and deceit. Because Drayman could not be located, service of process was effected by publication, and when Drayman failed to respond, default judgments were entered, awarding both compensatory and punitive damages.

At the beginning of the instant hearing, counsel for the plaintiffs argued that the debtor was collaterally estopped from litigating issues and/or damages which the state court had already decided via the default judgments. In the alternative, counsel argued that, at the least, the state court judgments establish plaintiff's prima facie case and shift the burden of proof to the debtor. Although in the Ninth Circuit a bankruptcy court in the proper circumstances may give collateral estoppel effect to a prior state court judgment, *see Campbell v. McClure (In re McClure),* 70 B.R. 955, 961 (Bankr.S.D.Cal.1987), we ruled that a state court *default* judgment neither collaterally estops the debtor nor establishes a prima facie case which the debtor must rebut. *Sixteen Twenty-eight Bellevue Ltd. Partnership v. Barigian (In re Barigian),* 72 B.R. 407, 410 (Bankr.C.D. Cal.1987).

 Section 523(a)(2)(A) makes nondischargeable a debt "for money, property, or services ... to the extent obtained by ... false pretenses, a false representation, or actual fraud." To establish nondischargeability the complaining creditors must prove that the debtor: (1) made the representation (2) which he (she) knew was false at that time (3) with the intent and purpose of deceiving the creditors (4) on which the creditors relied, and (5) that the creditor sustained a loss as the proximate result of the false representations. *In re Taylor,* 514 F.2d 1370, 1373 (9th Cir.1975). Although *Taylor* dealt with § 17(a)(2) of the prior Bankruptcy Act, the elements to be proved are the same under § 523(a)(2)(A). *See Citibank v. Quick (In re Quick),* 70 B.R. 562 564 (Bankr.S.D.Cal.1987); *Flynn v. Geremia (In re Cappelli),* 6 B.R. 303, 304 (Bankr.D.R.I.1980). Each element must be established by clear and convincing evidence. *Enterprise National Bank v. Zakovich (In re Zakovich),* 72 B.R. 271, 273 (Bankr.D.Colo.1987); *In re Quick, supra,* at 568; *In re Cappelli, supra,* at 304. Clear and convincing evidence is that which supports the Court's findings and conclusions "with a high degree of certainty," *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir.1985), although it is a lesser standard than the "beyond a reasonable doubt" standard applicable to criminal proceedings. *See Addington v. Texas,* 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323 (1979). *See also McCormick on Evidence* § 340 (E. Clea ry 3d ed. 1984).

The plaintiffs base their cases almost entirely on the allegation that the debtor misrepresented the safety of their investments. All of the plaintiffs testified that Drayman said that their investment was "guaranteed." Drayman denies ever issuing any guarantee, and the partnership documents contain no such guarantee. It is clear that the plaintiffs believed that their investments were safe. Even, assuming arguendo, that some sort of guarantee or warranty was made, there has been no showing that any representations by Drayman were false, or known to be false when made, or that they were made with the intent to deceive these plaintiffs.

The investments were secured by a deed of trust on each property in favor of all the limited partners. The face amount of each deed of trust included both the limited partners' total investment, and their expected profit. The limited partners were to receive their investment plus the agreed return on their money before the debtor could take any profit. However, the return provided by the deed of trust obviously depended on the joint assumption of the parties that the property would be developed and sold for a price sufficient to pay, first, the senior encumbrances, then the deed of trust in favor of the limited partners, and last, whatever profit remained for the general partner. It is true that if a guarantee were clearly made with reckless disregard of the truth, we could infer an intent to defraud, *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 934 (6th Cir.1986); *Houtman v. Mann (In re Houtmann)* 568 F.2d 651, 656 (9th Cir.1978); *Stamford Municipal Employees' Credit Union v. Edwards (In re Edwards)*, 67 B.R. 1008, 1010 (Bankr.D.Conn.1986), but that is not the case in this instance. Plaintiffs testified that Drayman, at the time they invested, seemed confident that each project would be developed and sold as planned. Drayman testified that he had a successful track record, that the projects were viable when the plaintiffs invested, but failed only after construction financing became unavailable in late 1981 and 1982, at which time the projects were foreclosed. In 1982, construction loans from commercial lenders were available only if the construction site was unencumbered, which these properties were not. Other sources of financing called for interest rates up to twenty-four percent, which made the projects economically unfeasible. The debtor's failure to predict the recessionary downturn in 1982 is not tantamount to a reckless disregard of the truth of statements made in late 1980 and early 1981, concerning the outlook for these investments. Moreover, it seems as likely as not that the plaintiffs misconstrued the alleged "guarantee" as an unconditional guarantee against any and all contingencies. No such guarantee was made by Drayman, but assuming arguendo that one were, even an unconditional guarantee would be dischargeable, absent a clear showing that it was false at the time, made knowingly, and with the intent and purpose of deceiving creditors.

The plaintiffs must also show reasonable reliance on the debtor's representations. *First Bank of Colorado Springs v. Mullet (In re Mullet)*, 817 F.2d 677 (10th Cir.1987). Each plaintiff testified that she relied on the alleged guarantee before investing. However, it is also clear that each had heard of Drayman through Lee Evangelista, who stated she had made a substantial profit within a short time, and that she believed that Drayman's next project would offer similar opportunities. Mrs. Evangelista's experience with Drayman, and her opinions, were communicated directly to Ms. Millias, at least, and then through her to the other plaintiffs. At her first meeting with Drayman, Ms. Hansen brought a cashier's check already made out to herself or to Richard Drayman, and her decision to invest appears to have been made before she ever saw Drayman. The testimony of Ms. Millias and Ms. Gibson also reflects a principal reliance on Evangelista's success in investments with Drayman. *See In re Zakovich, supra,* at 274; (reliance on prior successful dealing with the debtor and not on a financial statement); *Waterbury Conn. Teahers Federal Credit Union v. Ciampi (In re Ciampi)*, 14 B.R. 441, 443 (Bankr.D.Conn.1981) (same). Based on all of the evidence, we must conclude that the

plaintiffs relied primarily on the results Mrs. Evangelista had obtained, on other comments made among themselves, and not on any subsequent statements by Drayman concerning the relative safety of their investment.

However, even if plaintiffs could be found to have relied on Drayman's statements, as they allege, such reliance was not reasonable. Each plaintiff chose to invest in real estate limited partnerships, the purpose of which was construction of housing to be sold on speculation. Each expected that her investment would be returned intact, along with a fifty percent return, all within one year.[4] Each testified that she was not knowledgeable in business, yet each chose not to have the proposed investment analyzed by an accountant, attorney or investment professional, and instead chose to rely on an alleged "guarantee" from someone who, essentially, was a stranger. The expected rates of return, alone, should have suggested to the plaintiffs that a high degree of risk was inherent in these investments. These plaintiffs were not uneducated, illiterate, or otherwise disadvantaged. Therefore, they are held to a reasonable standard of care in dealing with even a sharp entrepreneur as Richard Drayman. He is not, incidentally, alleged to have engaged in a high pressure sales campaign. In these circumstances, plaintiffs' reliance on representations allegedly made by the debtor was not reasonable.

While it is most unfortunate that these plaintiffs, persons of modest means, have lost considerable amounts of money, earned the hard way, over a long time, they voluntarily entered into high-risk ventures which, if successful, would have provided a speedy, handsome return for all concerned. High risk and frequent failure is the downside of any promised above-average yield. In any event, exceptions to discharge must be strictly construed, *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986), and proof by clear and convincing evidence is a difficult standard to meet. Accordingly, based upon all of the evidence, we must conclude that the plaintiffs have not met their burden to show by clear and convincing evidence that the debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

Enter Judgment accordingly.

---

**4.** The expected profit on an eighteen month investment was seventy-five percent.