In re James PASCUCCI, et ux., Debtors.

**MORTGAGE GUARANTY INSURANCE CORPORATION, et al., Plaintiffs,**

v.

**James PASCUCCI, et ux., Defendants.**

**Bankruptcy No. LA 85–16460 SB.
Adv. No. LA 87–0873 SB.**

United States Bankruptcy Court,
C.D. California.

Aug. 3, 1988.

A. Clifton Hodges, Peter J. Sullivan, P.C., Marina del Rey, Cal., for plaintiffs.

George J. Cole, Tarzana, Cal., for debtors.

## AMENDED OPINION HOLDING DEBT DISCHARGEABLE

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. Introduction

This adversary proceeding raises the issues of whether the debtors' false financial statements and other misrepresentations are sufficient to render the resulting debt owing to plaintiffs nondischargeable under Bankruptcy Code § 523(a)(2)(A) or § 523(a)(2)(B), and whether the claim is barred by the applicable statute of limitations.

The adversary proceeding was tried to the Court on March 24, 1988. The following constitutes the Court's findings of fact and conclusions of law.

The Court holds that the applicable statute of limitations does not bar the claim in this adversary proceeding, because it had not run at the time that the bankruptcy case was filed. On the merits, the Court finds the evidence insufficient to support the nondischargeability of the debt, based either on fraud or on false financial statements.

### II. Facts

In late 1981 James and Christel Pascucci, joint debtors in this case, decided to purchase a single family residence from the developer of a 23–unit residential development in Chatsworth, California. The homes in this development were fairly large by Southern California standards,

and ranged in size from 2,500 to 3,100 square feet. On December 14, 1981, the debtors entered into an agreement to purchase one of the two largest houses in the development.

Shortly prior to their purchase of the Chatsworth house, the debtors had sold their smaller home in neighboring Woodland Hills, California. Escrow closed on this sale at the end of October, 1981. At the time of the sale of their Woodland Hills home, the debtors also purchased a much larger house in Bell Canyon, California. Escrow closed on this purchase also at the end of October, and the debtors moved into the Bell Canyon house at the beginning of November, 1981, and lived there until 1986.

The debtors originally intended to take possession of the Chatsworth house in January, 1982. However, escrow did not close on the purchase until February 10, 1982. In addition, the installation of upgraded carpeting and tile throughout the house delayed its readiness for occupancy until March, 1982.

The purchase of the Chatsworth house was financed with a new promissory note secured by a first deed of trust in the amount of $164,600. The documentation indicated that the remainder of the purchase price of $276,500 was to be paid through the assignment of two other trust deeds owned by Pascucci, and approximately $15,000 in cash and credits.

In the middle of December, 1981, the Pascuccis hired Springer Financial Services ("Springer") to obtain financing secured by a first and a second trust deed on the property. The Pascuccis filled out two hand-written credit applications, setting forth certain financial information. They also signed several financial statements in blank, and delivered them to Springer to have the financial information typed up. Various changes were made in the financial information before a final version was typed. At least two final versions, with minor differences, were ultimately prepared and submitted to financial institu-

tions. However, none of the final financial statements disclosed the Pascuccis' ownership of the Bell Canyon property.

The Pascuccis did not in fact pay $276,500 for the property: they paid only approximately $210,000 for it. The difference is accounted for principally by a second deed of trust that the Pascuccis executed on February 10, 1982, the date of closing, which purported to secure a promissory note in the amount of $57,000. However, no evidence of the note has surfaced. A reconveyance of the deed of trust was executed on the same date and was recorded on June 11, 1982.

On March 8, 1982, after the closing of the purchase of the property, the Pascuccis applied to Investment Savings and Loan Association ("Investment") for a loan secured by a junior trust deed [1] on the property. The loan application included the documentation for the purchase of the house at a price of $276,000. In addition, the Pascuccis signed a rider to the note and deed of trust on March 17, 1982 that made owner occupancy a condition of the loan. Investment funded a loan for $56,600 on or about March 23, 1982, which was secured by a trust deed on the property.

Investment obtained insurance from Plaintiffs Mortgage Guaranty Insurance Corporation and WMBIC Indemnity Corporation (collectively referred to as "MGIC") in which MGIC insured Investment against any default by the Pascuccis in their payments.

The Pascuccis never moved into the Chatsworth home. The preponderance of the evidence indicates that they intended to reside in the Chatsworth property and that they moved into the Bell Canyon property only on a temporary basis until the Chatsworth house was ready for occupancy. However, in March or April, 1982 they decided not to move to the Chatsworth house, because the neighborhood had become run down. There was a default in the payments to Investment prior to the Pascuccis' sale of the house in June, 1982, and MGIC

1. While it appears that the parties intended the Investment trust deed to be in second position, it also appears that it was actually in third

position until June, 1982, when the reconveyance of the prior second was recorded. Neither side has addressed this anomaly.

subsequently bought out Investment's position. MGIC foreclosed on the property in February, 1983, but was in turn foreclosed out by the holder of the first trust deed. In consequence, MGIC claims damages in the amount of the loan that it was required to pay off plus lost interest and incidental expenses.

## III. Discussion

### A. Statute of Limitations

The parties have argued extensively the statute of limitations issue both in their trial briefs and in the summary judgment motion heard by the Court before trial. The Court finds that MGIC's claim is not barred by the applicable statute of limitations.

■ The dischargeability provisions of the Bankruptcy Code contained in section 523 include no statute of limitations. Where the Bankruptcy Code is silent, and no uniform bankruptcy rule is required, the rights of the parties are governed by the underlying non-bankruptcy law. *Cf. Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979):

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy ....

Thus California law provides the applicable statute of limitations for MGIC's claim.

California's statute of limitations for fraud claims is three years. California Code of Civil Procedure § 338(4) (West 1982). As is typical of fraud statutes, the three years is tolled until the fraud is discovered or should be discovered: section 338(4) provides, "The cause of action ... is not to be deemed to have accrued until the discovery, by the aggrieved party of the facts constituting the fraud ....."

■ The statute of limitations was tolled by the filing of the bankruptcy case on November 8, 1985, and has not begun to run again. Bankruptcy Code § 108(c), 11 U.S.C. § 108(c) (Supp.1988) provides for the tolling of the statute of limitations:

> Except as provided in section 524 of this title, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor ... and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) 30 days after notice of the termination or expiration of the stay under section 362 [or] 722 ... of this title ... with respect to such claim.

The tolling of the statute of limitations provided in section 108(c) is in partial exchange for the automatic stay of section 362.

For dischargeable debts, the statute of limitations never begins to run again. It is tolled by the automatic stay until such debts are discharged under section 524.[2]

---

**2.** Bankruptcy Code § 524, 11 U.S.C. § 524 (1979 & Supp.1988), provides in relevant part:

(a) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1228(a)(1), or 1328(a)(1) of this title, or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the

The statute of limitations also does not resume, after the filing of the bankruptcy case, for debts that are nondischargeable under section 523(a)(2), (4), or (6). Section 523(c)[3] converts a nondischargeable debt under any of these provisions into a dischargeable debt, which is then discharged under section 524, unless a timely dischargeability complaint is filed. Bankruptcy Rule 4007(c)[4] requires that such a complaint be filed no later than 60 days after the first date set for the meeting of creditors under section 341(a),[5] approximately two months after the case is filed.

The deadline for filing a complaint under section 523(a)(2), (4), or (6) arrives while the automatic stay is still in force, and the statute of limitations is still tolled. Section 362(c)(2)[6] provides that the automatic stay continues in force until a discharge is granted or denied. Rule 4004(c)[7] permits the entry of a discharge only after the 60–day period of Rule 4004(a)[8] (which is the same as that under Rule 4007(c)) has

run. If any objection to discharge is filed, the discharge is delayed further until the objection is resolved.

■ Because MGC claims that its debt is nondischargeable under § 523(a)(2), the statute of limitations has not run unless it ran before this bankruptcy was filed. Thus, the statute of limitations has not run unless it began to run on or before November 8, 1982.

The evidence is not clear as to when MGIC received notice of the falsity of the statements by the debtors or should have discovered this. However, there is no evidence that such discovery occurred or should have occurred before November 8, 1982. In consequence, the Court finds that MGIC received such notice after November 8, 1982, and that the statute of limitations had not run on MGIC's claim at the time this bankruptcy case was filed. Thus this claim is not barred by the statute of limitations.

filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

3. Bankruptcy Code § 523(c), 11 U.S.C. § 523(c) (Supp.1988), provides:
 Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section.

4. Bankruptcy Rule 4007(c) provides in relevant part:
 A complaint to determine the dischargeability of any debt pursuant to § 523(c) of the Code shall be filed not later than 60 days following the first date set for the meeting of creditors held pursuant to § 341(a).

5. Section 341(a), 11 U.S.C. § 341(a) (Supp.1988), provides:
 Within a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors.

6. Section 362(c), 11 U.S.C. § 362(c) (1979 & Supp.1988), provides:
 (c) Except as provided in subsections (d), (e), and (f) of this section—

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and
(2) the stay of any other act under subsection (a) of this section continues until the earliest of—
(A) the time the case is closed:
(B) the time the case is dismissed; or
(C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

7. Bankruptcy Rule 4004(c) provides in relevant part:
 In a chapter 7 case, on expiration of the time fixed for filing a complaint objecting to discharge, the court shall forthwith grant the discharge unless (1) the debtor is not an individual, (2) a complaint objecting to the discharge has been filed, or (3) the debtor has filed a waiver under § 727(a)(10).

8. The entry of a discharge is authorized by Rule 4004(c) after the expiration of the time for filing an objection to discharge under section 727, 11 U.S.C. § 727 (1979 & Supp.1988). This time period, provided in Bankruptcy Rule 4004(a), is the same as that in Rule 4007(c). Rule 4004(a) provides in relevant part:
 In a chapter 7 liquidation case a complaint objecting to the debtor's discharge under § 727(a) of the Code shall be filed not later than 60 days following the first date set for the meeting of creditors held pursuant to § 341(a).

## B. Actual Fraud

### 1. *Issues to be determined*

The pretrial order set for trial six misrepresentations alleged by MGIC: (1) whether the Pascuccis originally agreed to pay $276,500 for the property; (2) whether they actually paid $266,070.47 plus credits of $10,060 for the property; (3) whether the fair market value of the property was $278,000; (4) whether the escrow documents reflected the true terms of the original property purchase; (5) whether the Pascuccis were residing in the property at the time of the loan application to Investment, and intended to continue to occupy it as their primary residence; (6) whether the Pascuccis intended to make payments on the loan as they fell due.

■ The Court finds it irrelevant what the Pascuccis originally agreed to pay for the property. The sale of the property closed prior to their application for the loan giving rise to this litigation. Thus the actual closing price is the relevant price for this controversy. The Court also finds that MGIC has presented no evidence on whether the Pascuccis intended to make payments on the loan as they fell due.

■ In addition, the alleged misrepresentation of fair market value cannot support a fraud claim. To support a fraud claim a representation must be of a present or past fact. A statement of opinion, in contrast, does not support a fraud claim, either under common law or under the Bankruptcy Code. *See Alvine v. Keller (In re Keller)* 72 B.R. 599, 602 (Bankr.M.D. Fla.1987). A representation of the value of property is a statement of opinion, that does not support a dischargeability claim based on fraud.

There thus remain two fraud claims under section 523(a)(2)(A): that the Pascuccis misrepresented what they actually paid for the property, and that it was to be owner-occupied.

### 2. *Applicable Law*

■ Common law has traditionally recognized four kinds of fraud: intentional misrepresentation, negligent misrepresentation, nondisclosure, and false promise. *See generally, Prosser & Keeton on the Law of Torts* 725–70 (W. Keeton 5th ed. 1984). Negligent misrepresentation does not support a dischargeability claim. Courts are divided on whether fraudulent concealment can support a dischargeability claim. *Compare Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir.1987), and *Minority Equity Capital Corporation v. Weinstein (In re Weinstein)*, 31 B.R. 804, 809 (Bankr.E.D.N.Y. 1983) (supports dischargeability claim), *with Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986), and *Davison–Paxon Co. v. Caldwell*, 115 F.2d 189, 191–92 (5th Cir.1940) (does not support dischargeability claim). MGIC bases its fraud claims on intentional misrepresentation.

■ The elements of a claim for fraudulent misrepresentation under section 523(a)(2)(A) are: (1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, and (7) that damage proximately resulted from the misrepresentation. *See, e.g., Sears Roebuck & Co. v. Mills (In re Mills)*, 73 B.R. 168, 170 (Bankr.D.Colo.1986); *Simmons v. Wade (In re Wade)*, 43 B.R. 976, 980 (Bankr.D. Colo.1984).

■ Each element must be established by clear and convincing evidence. *See, e.g., Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986); *First National Bank v. Kimzey (In re Kimzey)*, 761 F.2d 421, 423–24 (7th Cir.1985). Clear and convincing evidence is evidence sufficient to support the findings and conclusions with a high degree of certainty. *Hansen v. Drayman (In re Drayman)*, 77 B.R. 773, 775 (Bankr.C.D.Cal.1987). It is a lower standard, however, than the "beyond a reasonable doubt" standard applicable in criminal cases. *Drayman, supra,* at 775.

### 3. *Fraud as to MGIC*

The Court finds the following are supported by clear and convincing evidence: (1) that the debtors signed documents that they prepared or caused to be prepared that falsely set forth the actual purchase price of the property; (2) that the debtors knew that this representation was false; (3) that the representation was material; (4) that MGIC relied on these documents; (5) that its reliance was reasonable; and (6) that its damage proximately resulted from the misrepresentation. In short, MGIC has proved six of the seven elements of its case against the debtors under section 523(a)(2)(A) on the purchase price misrepresentation.

However, MGIC's proof falters on the issue of intent to deceive MGIC. MGIC must show actual intent to deceive it. *See, e.g., Gabellini v. Rega,* 724 F.2d 579, 581 (7th Cir.1984); *Security Title & Guaranty Co. v. Stivers (In re Stivers),* 84 B.R. 852, 854 (Bankr.S.D.Fla.1988). Constructive intent is insufficient to support a dischargeability claim. *Stivers, supra; Beck Suppliers, Inc. v. Havel (In re Havel),* 72 B.R. 264, 268 (Bankr.N.D.Ohio 1987). Recklessness is also insufficient to support a nondischargeable debt. *Charlie Kelton's Pontiac, Cadillac, Oldsmobile & Isuzu Truck, Inc. v. Roberts (In re Roberts),* 82 B.R. 179, 183–84 (Bankr.D.Mass. 1987). The intent to deceive must exist from the inception of the transaction. *Strunk v. Wood (In re Wood),* 75 B.R. 308, 313 (Bankr.N.D.N.Y.1987).

No evidence was offered at trial that the debtors intended to do any business whatever with MGIC, or that they even knew that MGIC was to play any role in the Investment loan. The only direct evidence on this subject was given by James Pascucci, who categorically denied any such knowledge or intent. In addition, James Pascucci testified that he believed that the information on the Bell Canyon property was provided to Springer, and that it was Springer that failed to include it in the typewritten financial statements.

Intent to deceive may also be inferred from the surrounding facts and circumstances of the case. *See, e.g., Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1287 (8th Cir.1987); *Van Roy v. Watkins (In re Watkins),* 84 B.R. 246, 249 (Bankr.S.D.Fla.1988); *Dawley v. Gould (In re Gould),* 73 B.R. 225, 227 (Bankr.N.D.N.Y.1987). The evidence does not support an inference that the Pascuccis intended to deceive MGIC at all, even apart from their denial of such intent. In consequence, the Court finds that the debtors did not intend to deceive MGIC with the false documents concerning the purchase price.

The Court also finds the evidence clear and convincing that the debtors represented that the property was to be owner-occupied, that MGIC relied on this representation, that its reliance was reasonable, and that it was damaged in consequence thereof.

The evidence is equivocal, however, as to whether this representation was false at the time that it was made. The evidence is unclear as to when the Pascuccis changed their minds and decided not to live in the Chatsworth House. In consequence, MGIC has failed to carry it burden of proof with respect to this representation.

### 4. *Fraud as to Investment*

MGIC also argues that, in consequence of its purchase of the Investment note and deed of trust, it is subrogated to the rights of Investment against the debtors. MGIC further argues that the debtors intended to deceive Investment, and in fact did deceive it, and that MGIC is now subrogated to the resulting nondischargeable debt.

This argument falters because MGIC has not shown that the claim by Investment against the debtors is not dischargeable. MGIC has offered no evidence that Investment relied on the debtors' representations concerning the price of the property or its owner-occupancy or that such reliance was reasonable.

In sum, MGIC has not carried its burden of proof for its claims under section 523(a)(2)(A).

## C. False Financial Statements

In addition to its actual fraud claims, MGIC claims that a nondischargeable debt arose as a result of the Pascuccis' false financial statements. MGIC contends that the financial statements were false, because they failed to disclose the Bell Canyon property and its encumbrances.

MGIC also contends that the financial statements were false in that they falsely represented that the Pascuccis were occupying the property as their residence, and that they intended to continue such occupancy. However, this representation is contained in a rider to the note and deed of trust, and not in the financial statements. Thus it does not support the false financial statement charge.

### 1. *Applicable Law*

Section 523(a)(2)(B) exempts from discharge any debt:

[F]or money, property, or services, or an extension, renewal or refinancing of credit, to the extent obtained by—

. . . . .

use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

■ The elements of a dischargeability claim under section 523(a)(2)(B) are: (1) the debtor obtained money, property, services or credit, (2) by a financial statement, (3) in writing, (4) concerning the debtor's or an insider's financial condition, (5) that the financial statement was materially false, (6) that the debtor caused it to be made or published with the intent to deceive the creditor, (7) that the creditor relied on it, (8) that such reliance was reasonable, and (9) that the loss was the proximate result of the publication of the financial statement. *See, e.g., Calumet National Bank v. Gallagher (In re Gallagher)*, 72 B.R. 830, 835 (Bankr.N.D.Ind.1987); *Enterprise Na-tional Bank v. Zakovich (In re Zakovich)*, 72 B.R. 271, 273 (Bankr.D.Colo.1987); *Armstrong Rubber Co. v. Anzman (In re Anzman)*, 73 B.R. 156, 162–63 (Bankr.D. Colo.1986).

### 2. *MGIC's Claim*

The Court finds the evidence clear and convincing that the written financial statement was materially false concerning the debtors' financial condition in that it failed to list the Bell Canyon property and its encumbrances, that MGIC relied on it, and that its loss was proximately caused by the false financial statement. However, the Court finds that MGIC does not satisfy the remaining elements under section 523(a)(2)(B): MGIC has not shown that the debtors obtained money, property, services or credit from it, that they intended to deceive MGIC, or that MGIC reasonably relied on the debtor's financial statements.

While the debtors clearly obtained credit through the financial statements, the credit was obtained from Investment, and not MGIC. The insurance provided by MGIC would qualify as property or services under the first element of the cause of action, if it had been obtained by the debtors. However, the insurance was provided to Investment, and not to the debtors.

Furthermore, as indicated *supra*, the Court has found that the debtors did not intend to deceive MGIC. The debtors had no intent to do any business with MGIC, and had no knowledge that Investment was obtaining insurance from MGIC in connection with its loan to the debtors.

■ In addition, MGIC offered no evidence at trial that its reliance on the financial statement was reasonable. Its evidence did show that the financial statement was sufficient to support the insurance. However, the reasonableness of a creditor's reliance on a false financial statement is determined by comparing the creditor's actual conduct with (1) a creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the property or services

were provided. *Borg Warner Central Environmental Systems, Inc. v. Nance (In re Nance),* 70 B.R. 318, 323 (Bankr.N.D.Tex. 1987); *John Deere Co. v. Iverson (In re Iverson),* 66 B.R. 219, 229 (Bankr.D.Utah 1986); *Sovran Bank v. Allen (In re Allen),* 65 B.R. 752, 763–64 (E.D.Va.1986), *appeal dismissed,* 823 F.2d 548 (4th Cir.1987); *North Park Credit v. Harmer (In re Harmer),* 61 B.R. 1, 8 (Bankr.D.Utah 1984). MGIC offered no evidence at trial on any of these issues.

 Furthermore, where a creditor has not done any previous business with a debtor, the creditor is required to make an independent investigation of the accuracy of the financial statement before it may reasonably rely on it. *See, e.g., First Bank v. Mullet (In re Mullet),* 817 F.2d 677, 681 (10th Cir.1987); *In re Bogstad,* 779 F.2d 370, 372 n. 4 (7th Cir.1985); *National Bank v. Bonnett (In re Bonnett),* 73 B.R. 715, 719–20 (C.D.Ill.1987). A negligent lender with sloppy credit practices does not qualify for a nondischargeable debt, where careful credit practices may prevent the extension of the credit at the outset. *Security Title & Guaranty Co. v. Stivers (In re Stivers),* 84 B.R. 852, 855 (Bankr.S.D. Fla.1988).

How much investigation is required turns on the facts and circumstances of the individual transaction. A creditor is not normally required to verify every item in a financial statement. A reasonable investigation may be limited to information that is readily accessible to a creditor.

However, MGIC has offered no evidence whatever of having made an independent investigation of the accuracy of the debtor's financial statements. In consequence it has not carried its burden of proof on the reasonableness of its reliance on them.

3. *Subrogation Claim*

As in the case of the fraud representations, MGIC contends that as a subrogee it stands in Investment's shoes in its false financial statement claim. As with the fraud representation, these shoes have too many holes.

 MGIC has presented no evidence that Investment relied on the financial statements, or that its reliance was reasonable. The Court can infer reliance on the financial statement from Investment's extension of credit after having received the financial statement. *North Park Credit v. Harmer (In re Harmer),* 61 B.R. 1, 8 (Bankr.D.Utah 1984); *Sparkman v. Janes (In re Janes),* 51 B.R. 932, 935 (Bankr.D.Kan.1985). Partial reliance upon a false financial statement is sufficient for dischargeability purposes. *Central National Bank & Trust Company v. Liming (In re Liming),* 797 F.2d 895, 897–98 (10th Cir.1986); *Harmer, supra,* 61 B.R. at 6–7; *Janes, supra,* 51 B.R. at 935.

However, the reasonableness of reliance must be demonstrated. MGIC has offered no evidence that Investment's reliance on the financial statements (if any) was reasonable. Lacking any such evidence, the Court declines to infer that Investment relied on the false financial statement. Thus the subrogation claim fails insofar as it is based on the false financial statements provided to Investment.

Thus, based on the evidence presented to the Court, MGIC has failed to prove Investment's dischargeability claim based on the false financial statements. In consequence, the subrogation claim fails insofar as it is based on the false financial statements that debtors provided to Investment.

### IV. Conclusion

The Court concludes that the plaintiff MGIC has not proved its dischargeability claim under either section 523(a)(2)(A) or Section 523(a)(2)(B). While MGIC has established some of the essential elements of each of these claims by clear and convincing evidence, the unproven elements require judgment for the debtors in this adversary proceeding.