In re Gary L. MILLER, Debtor.

Bonnie MOSS, et al., Plaintiffs,

v.

Gary L. MILLER, Defendant.

Bankruptcy No. 3–89–04623.
Adv. No. 3–90–0134.

United States Bankruptcy Court,
S.D. Ohio, W.D.

Sept. 30, 1991.

As Amended Nov. 8 and Dec. 19, 1991.

Gwenn S. Karr, Columbus, Ohio, for plaintiffs.

John R. Butz, Springfield, Ohio, for defendant.

Carl E. Juergens, Springfield, Ohio, trustee.

## DECISION AND ORDER GRANTING SUMMARY JUDGMENT

WILLIAM A. CLARK, Bankruptcy Judge.

This matter is before the court upon the plaintiffs' motion for summary judgment, supported by affidavits of Gay L. Williams and Gaye Rutledge. The defendant/debtor filed a memorandum in opposition to the motion and an affidavit of defendant. Plaintiffs filed a reply. This court has jurisdiction in this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this judicial district. This matter is a core proceeding which the court may determine in accordance with 28 U.S.C. § 157(b)(2)(I)—Determinations as to the Dischargeability of Particular Debts. This decision shall constitute the court's findings of fact and conclusions of law.

## FINDINGS OF FACT

Gary L. Miller is the President and sole shareholder of Physicians Management Resources, Inc. ("Physicians Management"), an Oklahoma corporation incorporated in 1985. Through the corporation Mr. Miller provided services as a management consultant. In such capacity he was hired by G. Michael Steelman to manage the Steelman office staff. The relationship was formalized by a written contract in July, 1985. Mr. Miller began working in Dr. Steelman's medical office three days each week, providing management services and supervision of personnel, marketing, accounts receivable and computers. The personnel in Dr. Steelman's office became employees of Physicians Management Resources, Inc. Dr. Steelman paid Miller's corporation a bimonthly flat fee for the services from which Physicians Management paid the salaries of Dr. Steelman's office staff and

their health, life and disability insurance, vacation pay and contributions to a profit sharing plan. The profit sharing plan was known as Physicians Management Resources, Inc. Money Purchase Plan.

The Summit Group provided administrative services for the pension plan, including preparation of plan documents, year-end valuation reports and the forms required by Internal Revenue Service. Gay L. Williams is the Vice–President and part owner of the Summit Group. She provided accurate copies of all pension plan documents (Exhibits A–1 through A–8 of the Williams Affidavit). Gary Miller, as director of Physicians Management, adopted the Pension Plan for the corporation's eligible employees on October 27, 1986. He also executed a Pension Plan and Trust Agreement as President of Physicians Management and trustee of the Pension Plan. (Exhibit A–1, Page 17–05) The plan became effective November 1, 1985 and operated on a fiscal year ending October 31.

The Pension Plan provided that the corporation would contribute for each employee seven and one-half (7.5%) percent of annual salary. Employees were 100% vested at all times and became qualified after completing one hour of service. The Pension Plan opened a money market savings account at Alliance Bank in Oklahoma City, Oklahoma which served as the "Trust Account".

Physicians Management Resources, Inc., employed Gaye Rutledge from July 1986 until June 1988 as a Systems Administrator. She acted as office manager and bookkeeper from October 1986 until June 1988. As bookkeeper and office manager Gaye Rutledge was the authorized signer on the trust account at Alliance Bank. Copies of deposit slips, checks and monthly statements of the trust account are attached to the Rutledge affidavit as Exhibit B–1.

The Pension Plan was funded initially with $19,000 in two deposits as of October 30, 1986. During the first fiscal year the employer contributed $21,303.19 which earned interest of $165.86. Minton Schmid, whose relationship to Physicians Management is not explained, had unexplained transactions with the pension fund in 1987. Minton Schmid may have borrowed $4,801.50 by a check on January 22, 1987. A Minton Schmid check for $1,750.94, possibly a loan payment, was deposited to the trust account on January 28, 1987. Internal Revenue Service Form 5500–R for plan year ending October 31, 1987 lists interest income earned from Minton Schmid as $123.74.

The total deposits and earned interest for years ending October 31, 1986 and October 31, 1987 were $42,803.56. Service charges of $59.28 were incurred in 1987. During 1986 and 1987 Mr. Miller made withdrawals which totaled $38,521.27. Gary L. Miller did not provide The Summit Group with financial information to complete reports for the plan years ending October 31, 1987 and 1988.

Checks from the fund were written for the following purposes:

| | | |
|---|---|---|
| Check # 96— | $ 5,000 | Earnest money on real estate |
| Check # 97— | 200 | Fluid level test |
| Check # 99— | 4,801.50 | Minton Schmid |
| 7 checks totaling | 22,900 | Oil & Gas Lease—LP Oil |
| Check # 1046— | 5,000 | 5000 shares Tanzanian Minerals |
| 3 checks totaling | 619.77 | Administrative Expenses |

Gary L. Miller acknowledges that he invested pension funds of $22,900 in LP Oil Company, a corporation which he owned. He acknowledges that he invested pension funds in Tanzanian Minerals, Dime Mortgage Company and in a public utility stock. Those investments were suggested by Jim First, a stockbroker and investment counselor associated with the Summit Group.

Check number 97 for $200 for a fluid level test related to the oil well leases expenses. Miller purchased Dime Mortgage Company stock and stock of a public utility, whose name he could not recall. He later sold those stocks and believes the sale was for a profit. The balance sheets do not account for these stock transactions. The Tanzanian Mineral stock which cost $5,000 was worth $2,600 on October 31, 1987, thus representing a paper loss. In September, 1988, $8,861.89 was deposited in the pension trust account and withdrawn without explanation on the next day. After September, 1988 service charges eroded the trust account to a zero balance. The trust account was closed May 23, 1989.

### SUMMARY JUDGMENT

The motion for summary judgment is governed by Fed.Civ.P. 56 which provides in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The standard for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The new emphasis on the use of summary judgment and its effect upon litigation is discussed by the Sixth Circuit in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989).

Application of the standards discussed in the *Anderson, Celotex* and *Street* cases to the issues presented in this proceeding will determine whether summary judgment should be rendered.

### CONCLUSIONS OF LAW

Plaintiffs contend that the actions of the debtor require a finding of nondischargeability of their claims pursuant to 11 U.S.C. § 523(a)(4) which provides:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
>   *   *   *   *   *   *
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny;

Since defendant was acting as the employer and administrator of the pension plan at all times pertinent to the case, there is no question that Gary L. Miller was a fiduciary who was bound by the requirements of utmost trust and fair dealing with respect to the pension plan which contained the employee contributions of the plaintiffs.

The next question for consideration is whether the debtor committed "defalcation" within the meaning of Section 523(a)(4). An abundance of authority shows that the term *"defalcation"* is quite broad and intended to include innocent or negligent defaults in duty as well as intentional acts. The mere deficit resulting from a fiduciary's account which results from misconduct or intentional act of the debtor is defalcation. Defalcation is the failure of a public officer to account for monies received by him in his official capacity. *Kleppinger v. Kleppinger (In re Kleppinger)*, 27 B.R. 530 (Bankr.M.D.Pa. 1982). Failure to make full disclosure can constitute defalcation. *Black's Inc. v. Decker (In re Decker)*, 36 B.R. 452, 458 (D.N.D.1983).

The court must consider the acts of the debtor in relation to the illustrations of defalcation noted in the cases named above.

■ The debtor acknowledges that he invested $22,900 in LP Oil Company. The investment was 42% of the pension plan funds. The debtor was the sole shareholder of LP Oil Company which needed funds to operate several oil wells in Oklahoma for owners during the time the debtor invested the pension funds in LP Oil.

The debtor violated his fiduciary duty when he invested 42% of the pension fund assets in LP Oil, which he controlled. Those duties are described in Title 29 as follows:

§ 1104 Fiduciary duties

(a)(1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

. . . .

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

29 U.S.C. § 1104.

The pension plan trust agreement provides in pertinent part, as follows:

2.02 No Diversion of Funds. It shall be impossible ... for any part of the corpus or income of the trust to be used for, or diverted to, purposes other than for the exclusive benefit of employees ...;

2.04 Standards of Conduct. The Trustee, Plan Administrator and all other Fiduciaries with respect to the Plan shall discharge their duties solely in the interests of Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administration; with the care, skill, prudence and diligence, under the circumstances then prevailing, that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and in accordance with the Plan and the rules and directions of the Plan Administrator.

■ Gary L. Miller violated the fiduciary duties described in the pension plan trust agreement, when he invested a large percentage of the pension fund in his own operating oil well company for his own benefit. He violated his fiduciary duty to act in the interest of the pension plan participants and to use prudence to diversify the investments to minimize the risk of large losses. The LP Oil investment was a conflict between his interests and the interests of the participants in the pension fund. Debtor has presented no evidence to explain his investment in Dime Mortgage or a public utility stock or what happened to those investments. A dereliction of debtor's duties was his failure to provide financial information to The Summit Group for the plan years ending October 31, 1987 or October 31, 1988.

■ Debtor invested $5,000 in Tanzanian Minerals in July 1987, which it would be difficult to characterize as a prudent investment for a pension fund. Dollar stocks are notorious for their failures and certainly for the nature of their high risk. This investment does not meet the "prudent man" test required of a fiduciary under the standards of conduct described in 29 U.S.C. § 1104 and section 2.04 of the pension plan.

The plaintiffs in this case have the burden of proving their case by a preponderance of the evidence. The United States Supreme Court clarified the plaintiffs' burden of proof in *Grogan v. Garner*, — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Supreme Court stated:

[I]t is fair to infer that Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions. *Id.,* 111 S.Ct. at 660. In this proceeding the plaintiffs have demonstrated evidence to prove defalcation by Gary L. Miller.

■ Defendant maintains that the plaintiffs' claims are barred by the applicable statute of limitations, which reads, in relevant part, as follows:

§ 1113 Limitation of actions

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after ...—

(1) ...

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

29 U.S.C. § 1113.

With respect to the statute of limitations, the defendant asserts that:

Plaintiff Gaye Rutledge by her own affidavit had knowledge of the alleged breach more than three years prior to June 20, 1990. In all likelihood in a small office setting, the other Plaintiffs were also aware of the investments made by Mr. Miller (Doc. 16 at 2).

Defendant's argument overlooks the fact that June 20, 1990 (the date the adversary proceeding was filed) is not the relevant date for determining the applicability of the three-year statute of limitations. The statute of limitations was tolled by the filing of the defendant-debtor's bankruptcy petition on December 14, 1989, and has not begun to run again. *Belford v. Martin–Trigona (In re Trigona ),* 763 F.2d 503, 506 (2d Cir.1985); *Mortgage Guaranty Insurance Corp. v. Pascucci (In re Pascucci ),* 90 B.R. 438, 442 (Bankr.C.D.Cal.1988). Tolling of the statute of limitations is provided for in § 108(c) of the Bankruptcy Code:

(c) Except as provided in section 524 of this title, if applicable nonbankruptcy law ... fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor ..., and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) 30 days after notice of the termination or expiration of the stay under section 362, 722, 1201, or 1301 of this title, as the case may be, with respect to such claim.

11 U.S.C. § 108(c).

The tolling of the statute of limitations provided in § 108(c) recognizes the effects that the automatic stay may have upon the claims of creditors:

Recognizing that a petition in bankruptcy could sometimes give a debtor unfair advantage over a claimant by allowing the debtor to remain under the protection of the automatic stay until the limitation period governing the claimant's action had expired ... congress acted to solidly preserve the rights of a party "stayed from commencing or continuing an action against the debtor because of the bankruptcy case." S.R.Rep. No. 95–989, 95th Cong., 2d Sess. 30 (1978); H.R. No. 95–595, 95th Cong., 2d Sess. 318 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. It did so by extending the period for "commencing or continuing a civil action" against the debtor to, at a minimum, 30 days after termination or expiration of the automatic stay.

*Morton v. National Bank of New York City (In re Morton ),* 866 F.2d 561, 566 (2d Cir.1989). In the instant bankruptcy case, there has been no termination or expiration of the automatic stay under § 362,[1] and

---

**1.** The relevant portion of § 362 provides that: (2) the stay of any other act under subsection (a) of this section continues until the earliest of—

(A) the time the case is closed;

(B) the time the case is dismissed; or

(C) if the case is a case under chapter 7 of this title concerning an individual ..., the time a discharge is granted or denied. 11 U.S.C. § 362(c)(2).

therefore the statute of limitations remains tolled.

The record before the court reveals that the first transfer to LP Oil by the debtor was in the amount of $3000 and occurred on May 2, 1987 (Doc. No. 11, Exhibit 15), and is the earliest possible date that any of the plaintiffs could possibly have had knowledge of the debtor's breach of duty. Even if it could be proven that Ms. Rutledge had "actual knowledge" of the debtor's breach of duty at this time, the date is well within the three year period prior to December 14, 1989, and therefore the statute of limitations is not applicable.

## CONCLUSION

Based upon the foregoing reasoning, the court finds that plaintiffs' Motion for Summary Judgment is well considered. The court grants summary judgment for plaintiffs against defendant, Gary L. Miller, for $41,168.44 and orders that said judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

It is so ordered.

This bankruptcy case has obviously not been closed or dismissed, and no discharge has been granted to the debtor.