**In re Gerald H. GALBREATH, III, Debtor.**

**PAN–WESTERN LIFE INSURANCE COMPANY, Plaintiff,**

v.

**Gerald H. GALBREATH, III, Defendant.**

**Bankruptcy No. 2–86–03249. Adv. No. 2–86–0319.**

United States Bankruptcy Court, S.D. Ohio, E.D.

April 11, 1990.

Bruce Ingram, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for plaintiff.

Thomas C. Scott, Thompson, Hine & Flory, Columbus, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM OPINION

DONALD E. CALHOUN, Jr., Bankruptcy Judge.

This cause came on for trial commencing August 1, 1988, upon the Complaint filed by Pan–Western Life Insurance Company ("Pan–Western" or the "Plaintiff"). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this District. This is a core proceeding under 28 U.S.C. § 157(b)(2).

### I. PROCEDURAL BACKGROUND

On November 21, 1986, Pan–Western timely filed a Complaint against the Debtor Gerald H. Galbreath, III ("the Debtor" or "the Defendant") and several other defendants, seeking a determination of dischargeability of debt, based upon four transactions in which the Debtor played a role. The transactions pertained to three parcels of real estate known as the "Babbert Tract", the "Brandenberry Center" and "Oak Creek". The Plaintiff also seeks a money judgment for amounts due pursuant to two of the transactions. All defendants but the Debtor were ultimately dismissed. The matter went to trial on August 1, 2 and 3, 1988. The parties requested a transcript of the trial and an opportunity to submit post-trial Briefs.

Pan–Western then filed suit against the dismissed defendants in the Franklin County Court of Common Pleas and a jury trial was held on January 23–27, 1989 in the case of *Pan–Western Life Insurance Co. v. Grier, et al.,* Case No. 88CV–08–5561. After the jury rendered the verdict in favor of Pan–Western, Pan–Western moved to reopen this case and enter into evidence (1) the record of trial proceedings, and (2) the deposition testimony of Jerry Grier taken on January 25, 1989. Pan–Western further moved for entry of partial summary judgment against the Debtor based upon the additional evidence. The Court granted the Motion to Reopen the case, admitting the additional evidence, but denied the Motion for Partial Summary Judgment.

### II. FINDINGS OF FACT

Upon the evidence presented in this case, the Court finds and concludes as follows:

#### A. *Background*

The Galbreath Family has been a moving force in the Columbus, Ohio area for some time. The Debtor's father, Gerald H. Galbreath, Jr. ("Galbreath Jr."), was one of the original founders of Pan–Western and served as a Director of Pan–Western since its inception in 1963. He was an enthusiastic supporter of Pan–Western, an active director and shareholder of the corporation. His primary business, however, was real estate development conducted through a partnership known as Galbreath Brothers.

Walter Martin has been a director and President of Pan–Western since its inception. During the course of their mutual affiliation with Pan–Western, Mr. Martin developed a close relationship of trust and confidence with Galbreath Jr.

In 1968, Gerald H. Galbreath, III (the Debtor), graduated from law school, passed the Ohio Bar and was licensed to practice law. Upon graduation, he joined his father in the real estate development business, describing himself professionally as a "promoter", "syndicator" and "developer". At the time of the transactions at issue, the Debtor had been involved in the real estate development business for approximately fifteen years, and had developed extensive familiarity with and knowledge of the Central Ohio real estate market.

Beginning in 1980, Galbreath Jr. began grooming the Debtor to assume control of Galbreath Brothers and the affiliated real estate businesses. He introduced the Debtor to Mr. Martin and the Debtor began

joining their meetings and conferences. Galbreath Jr. requested that Martin deal with the Debtor on the same basis and with the same trust as he had in Galbreath Jr. Soon after the death of his father in October, 1981, the Debtor became a director of Pan–Western, a position he held until April, 1984. By the time of the transactions at issue, the Debtor had also become a shareholder in Pan–Western.

As a result of a variety of factors, by the fall of 1982, the Debtor and his affiliated entities fell into severe financial difficulties. The installment payments due Pan–Western on outstanding mortgages became slow, although the obligations continued to be met. Due to the financial difficulties, the Debtor began pursuing sale of certain properties, and he so advised Martin.

## B. *The Transactions*

### i. *The Babbert Tract*

The Babbert Tract consisted of 7.759 acres of vacant land located on South High Street in Columbus, Ohio. It was originally purchased in 1972 by American Urban Properties, an Ohio limited partnership controlled by the Galbreaths, for the purchase price of $77,600. Galbreath Brothers unsuccessfully attempted to develop the property with low-income housing. In 1978, Pan–Western loaned $95,000 to American Urban Properties, which was secured by a mortgage on the Babbert Tract. In May, 1981, a mortgage was granted to Gardes Investments, Ltd. In November of 1982, the property, which had changed hands several times, was owned by Scioto Properties Limited, of which the Debtor was managing partner.

In October of 1982, the debts to Western & Gardes Investments were in serious default.[1] In fact, Gardes had apparently obtained a judgment on the note and was vigorously pursuing collection. In November, the Debtor advised Mr. Martin that the Babbert Tract would be sold to J–5, Inc. who wished to finance the transaction through Pan–Western. J–5, Inc. was controlled by Jerry Grier who had a longstanding relationship with the Debtor, beginning when they were both in law school. Mr. Grier had been employed by a Galbreath affiliate between 1967 and 1974 to develop low-income housing projects. Upon leaving that employment in 1974, he entered private practice. In 1981, Mr. Grier had received a legal fee in excess of $100,000. and was seeking an investment tax shelter. After negotiations with the Debtor, Grier formed J–5, Inc., for the purpose of acquiring the property, and J–5, Ltd. for the purpose of investing $50,000.00 in Galbreath Brothers. In exchange for the investment, the Debtor agreed to document losses of $75,000.00 for Grier, and to repay the investment at the end of one year. Mr. Grier had also been employed by Housing and Urban Development ("HUD") since 1978 as an attorney, including chief counsel.

The Debtor and Mr. Grier represented to Mr. Martin that J–5, Inc. was purchasing the property for $220,000 and intended to develop the property with low-income housing through financing provided by HUD, although neither was the case.

On November 15, 1982, Pan–Western loaned J–5, Inc. $165,000, and J–5, Inc. granted a mortgage on the property. The proceeds of the loan were used to pay the existing Pan–Western mortgage in the amount of $112,672.08, which was long past due.[2] Coincidentally, Gardes Investment was satisfied on November 15, 1982. Notably, the Debtor refunded Grier's partnership contribution of $50,000.00 on or about December 20, 1982.

The Babbert Tract was never developed with low-income housing, or any other type of development. In fact, J–5 never even applied for HUD financing or made any other efforts directed toward development

---

**1.** The principle balance due Pan Western of $95,000 had become due and payable in full on October 6, 1981. The principle balance of $93,-399.12 plus interest due Gardes became finally due and payable in full on September 30, 1982, after approximately 14 extensions.

**2.** This amount included the original principle balance of $95,000 plus accrued interest of $17,-672.08.

of the property, such as site preparation, engineering studies, architectural drawings and the like. No payments were ever made on the new Pan–Western loan, and in April of 1984, pursuant to an agreement between the parties, the Debtor delivered to Pan–Western a deed to the property in lieu of foreclosure. However, no one recorded the deed. When this was discovered by Pan–Western in December, 1984, Pan–Western prevailed upon the Debtor to obtain a second quit-claim deed, which he did and which was recorded. In the meantime, however, at least one judgment lien attached to the property in the amount of $36,000.[3]

ii. *Brandenberry Center*

In 1975, Galbreath Brothers had acquired two parcels of real estate, consisting of 1.367 acres and .745 acres, for a purchase price of $55,398.62. In 1978, the larger parcel was improved with a small strip shopping center consisting of 3,950 square feet called Brandenberry Center. The smaller parcel was improved with a commercial building of 5,000 square feet. On July 21, 1978, Pan–Western had made a loan to Galbreath Brothers of $160,000.00 secured by Brandenberry Center.

In January, 1981, Galbreath Brothers entered into several agreements relating to Brandenberry Center with Harry Bahrick, a local investor. Pursuant to the agreements, Bahrick leased Brandenberry Center from Galbreath Brothers for a period of six years, prepaying rent in the amount of $117,000. The agreements also granted Bahrick an option to purchase Brandenberry Center for the balance due under existing mortgages on the property at the time the option was exercised, less any amounts in default under the mortgages, plus the sum of $48,000. Finally, the agreements included a conditional assignment of rents to Bahrick. Contemporaneously with the agreements, Bahrick made an immediate loan to Galbreath Brothers in the amount of $48,000.

On September 26, 1983, Galbreath Brothers entered into a general partnership,

known as LG Investment Company ("LG"), with Warren H. Leimbach, a local neurosurgeon. One of the express purposes of LG was to acquire and operate Brandenberry Center. Dr. Leimbach made an initial capital contribution to LG of $100,000. As part of its capital contribution, Galbreath Brothers transferred to LG its interest in Brandenberry on October 20, 1983.

On October 28, 1983, at the request of the Debtor, Pan–Western made a loan of $450,000 to LG secured by a new mortgage on Brandenberry Center and an assignment of a life insurance policy by Dr. Leimbach. Pan–Western evidently did not obtain any title search reports, a title insurance policy or seek current professional appraisals of the property. Rather, Pan–Western relied on implied and express assurances and representations made by the Debtor, and the Debtor's position as a director of Pan–Western and an attorney. In any case, the proceeds of the loan were disbursed as follows: $261,262.31 to Pan–Western to pay off the outstanding mortgage obligation in the amount of $198,-182.34 and an unsecured debenture in the amount of $63,079.97; $140,686.15 to Buckeye Federal Savings and Loan Association to satisfy its first mortgage on one of the Brandenberry Center parcels; and $48,-051.54 to LG.

Upon default of payment due under the note and mortgage, Pan–Western foreclosed its mortgage and obtained a Judgment on January 27, 1986, in the amount of $447,440.75, plus interest at the rate of 12½% from December 1, 1984. Pan–Western purchased the property at foreclosure sale for the sum of $210,000. On September 2, 1987, the Court of Common Pleas of Franklin County, Ohio entered an Entry of Confirmation and Order of Distribution, which reduced the Judgment by the proceeds of sale and other sums collected by Pan–Western, to $419,352.14 plus interest at the rate of 12½% from August 15, 1987.

iii. *Oak Creek*

In 1975, the London Land Company, an Ohio general partnership affiliated with

---

3. The Judgment was obtained on September 24, 1984, by Larry Funk against the Debtor, J–5, Ltd., J–5, Inc. and Galbreath Brothers, among others. It was recorded on the same day.

Galbreath Brothers, acquired a 5.339 acre parcel of real estate in Columbus, Ohio, known as Oak Creek. In 1977, the property was improved with a tennis and fitness club, financed by a mortgage loan from Ohio Financial Service Corporation in the amount of $1,050,000. On July 31, 1979, Pan–Western made a loan to London Land Company of $275,000, secured by a second mortgage on Oak Creek. Finally, on September 17, 1982, BancOhio National Bank made a loan of $202,542.80 to London Land Company, secured by a third mortgage on Oak Creek.

Shortly after LG was formed, London Land Co. had transferred its interest in the Oak Creek properties to Scioto Venture Limited, yet another Galbreath affiliation. In addition to Brandenberry Center, Galbreath Brothers also contributed to LG its 95% interest as general partner of Scioto Venture. Close on the heels of the Brandenberry transaction, the Debtor requested Pan–Western to make an additional loan to LG in the amount of $475,000 to be secured by Oak Creek.

The negotiations resulted in several transactions. The property was divided into three sections:

(a) 1.1299 acres (consisting of two smaller parcels of .9547 acres and .1752 acres);

(b) 2.201 acres, on which was situated a sports facility building, and

(c) 2.01 acres, improved with outdoor tennis courts.

The smallest parcel was discussed in some detail, but it does not appear that this parcel is at issue in this adversary proceeding.[4]

The 2.201 acres was improved with a sports facility building, which was sold to LG. Scioto Venture acquired the land on December 19, 1983, for the sum of $78,000. The land only was sold to Pan–Western on December 22, 1983, for the sum of $124,-000. Upon closing, Pan–Western immediately leased the property to LG, which then assigned the lease to Scioto Venture. In connection with the sale, Pan–Western relied on certain implied and express representations by the Debtor regarding the status of the real estate taxes on the property and the value of the property, and on the assurance by the Debtor that he would deliver a title insurance policy to Pan–Western. None of these assurances or representations were fulfilled.

The 2.01 acre parcel contained outdoor tennis courts. On December 19, 1983, Pan–Western loaned $386,000 to LG, secured by the building on the 2.201 acre parcel, and a collateral assignment of Dr. Leimbach's life insurance policy.[5] Although not clear in the record, it also appears that the second mortgage held by Pan–Western remained in effect to further secure the new loan. That mortgage encumbered both the 2.201 acre parcel and the 2.01 acre parcel. The proceeds of the loan were disbursed as follows: $365,-921.66 to Pan–Western to satisfy the balance due under its existing second mortgage on the property; and $20,078.34 to Scioto Venture Limited. It appears that Pan–Western again did not attempt to obtain updated appraisals, conduct a title search, or acquire a title insurance policy. Pan–Western did, however, rely on the Debtor's assurances regarding real estate taxes, Dr. Leimbach's insurance policy, the priority of Pan–Western's mortgage, and the value of the property.

LG defaulted under the lease with Pan–Western, and also under the promissory note and mortgage. On March 25, 1986, Pan–Western obtained a Judgment against LG and the Debtor, among others, in the amount of $18,020 plus interest from November 22, 1984, on account of the lease, and in the amount of $386,000 plus interest from October 16, 1984, under the note.

---

4. For informational purposes, the land was sold to Scioto Venture on December 19, 1983, and the building was sold to ABS Associates, an Ohio partnership affiliated with the Debtor. ABS leased the land from Scioto Venture. Shortly thereafter, the land was bought by Pan–Western, and Scioto Venture assigned the ABS lease to Pan–Western.

5. This was the same collateral assignment which also secured the Brandenberry loan.

### C. *The Case*

The Debtor filed his petition for relief under Chapter 7 of the Bankruptcy Code on August 21, 1986. Pan–Western timely filed a Complaint containing four counts.[6] Count I seeking a determination that the Judgment regarding the Brandenberry Center in the amount of $447,440.75 is nondischargeable; Count II requesting a money judgment in the amount of $124,000 and a declaration that that amount and the Judgment for $18,020 are nondischargeable; Count III seeking a declaration that the Judgment in connection with the Oak Creek loan in the amount of $386,000 is nondischargeable; and Count IV seeking a money judgment for damages in connection with the Babbert Tract, and a determination that that amount is nondischargeable.[7]

### III. CONCLUSIONS OF LAW

The Plaintiff asserts that the facts of this case support a finding of nondischargeability of debt pursuant to Section 523(a)(4) or Section 523(a)(2)(A).

### A. *Dischargeability Under Section 523(a)(4)*

Section 523(a)(4) provides in pertinent part:

A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, ....

State law controls in determining the nature of legal interests for purposes of determining the dischargeability of debts. *Capitol Indemnity v. Interstate Agency, Inc. (In re Interstate Agency, Inc.),* 760 F.2d 121 (6th Cir.1985); *Barclays American/Business Credit, Inc. v. Long (In re Long),* 774 F.2d 875 (8th Cir.1985).

It is well established that a corporate director is a fiduciary under Ohio law.[8] *See, Radol v. Thomas,* 772 F.2d 244 (6th Cir. 1985), *cert. den.* 477 U.S. 903, 106 S.Ct. 3272, 91 L.Ed.2d 562 (1986); *Ohio Drill and Tool Company v. Johnson,* 625 F.2d 738 (6th Cir.1980); *Apicella v. PAF Corporation,* 479 N.E.2d 315, 17 Ohio App.3d 245 (Ct.App.1984); *Jordan v. Global National Resources, Inc.,* 564 F.Supp. 59 (S.D.Ohio 1983). *See also, Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). A fiduciary is not relieved of his duties when dealing for himself. *Seagrave Corp. v. Mount,* 212 F.2d 389 (6th Cir.1954).

The question then becomes, does the fiduciary relationship occupied by a corporate director fall within the scope of the term "fiduciary capacity" as it is used in Section 523(a)(4). The Debtor argues that it does not; he asserts that only technical trusts fall within the parameters of Section 523(a)(4) and that the "fiduciary capacity" required by that section pertains only to trustees of such trusts. In support of his position, the Defendant cites *Davis v. Aetna Acceptance Company,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Johnson,* 691 F.2d 249 (6th Cir.1982), and various decisions of this Court. It is well settled that Section 523(a)(4) is not applicable to trusts *ex maleficio,* arising by virtue of the wrongful act, such as resulting or constructive trusts. The cases cited by the Defendant so held, but do those decisions foreclose the application of Section 523(a)(4) to other fiduciary relationships? The Court is constrained to say no.

The cases cited by the Debtor, while properly decided in their own contexts, do not establish the limits of § 523(a)(4) urged by the Debtor. In *Davis,* the Court addressed the relationship between an automobile dealer and Aetna Acceptance Com-

---

**6.** In its discussion above and below, the Court has addressed the transactions in a different order than as set forth in the Plaintiff's Complaint.

**7.** The Debtor has asserted that this Court is without jurisdiction to enter a money judgment in this case. Pan–Western, of course, refutes this. Neither party has provided the Court with authority for their positions. Nonetheless, the Court is satisfied that it has authority to enter such a judgment, especially since this matter is a core proceeding. *See,* e.g., *In re Pasulo,* 25 B.R. 583 (Bankr.Conn.1982); *In re Record Co., Inc.,* 8 B.R. 57 (Bankr.S.D.Ind.1980); *In re Constantino,* 72 B.R. 231 (Bankr.N.D.Ohio 1987); *In re Novak,* 97 B.R. 47 (Bankr.Kan.1987).

**8.** Cf: 12 Ohio Jur.3rd *Business Relationships* § 420 (1989).

pany, which financed the acquisition of inventory for the dealer. It appears that the arrangement was merely floor-plan financing, and the dealer failed to remit proceeds of the sale to Aetna as required per the contract between the parties. Upon filing of a petition in bankruptcy by the dealer, Aetna sought a declaration of nondischargeability of debt pursuant to Section 17(a)(4) of the Bankruptcy Act, 11 U.S.C. § 35 (repealed 1978). Subdivision 4 of § 17(a) excepted from a debtor's discharge those liabilities "created by his fraud, embezzlement, misappropriation or defalcation while acting an officer or in any fiduciary capacity." [9] 3 *Collier on Bankruptcy* § 523.14 (15th ed. 1989). The Supreme Court acknowledged that the statute speaks of technical trusts, not those implied from the contract, and the contract between the parties did not establish a fiduciary relationship for purposes of Section 17 of the Bankruptcy Act. Similarly, the Sixth Circuit Court of Appeals in *Johnson* addressed the trust aspects established in the Michigan Building Contract Fund Act, and whether or not that "trust" satisfied the elements of Section 17 of the Bankruptcy Act. *Davis* and *Johnson* are similar to those cases previously faced by this Court. However, *Davis, Johnson* and previous cases decided by this Court did not preclude application of § 523(a)(4) to other fiduciary relationships.

Several courts which have considered the issue, have held that other fiduciary relationships fall within the reach of § 523(a)(4). The Second Circuit Court of Appeals has long so held. In *In re Hammond*, 98 F.2d 703 (2d Cir.1938), *cert den.* 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938), the court held that a corporate director acting in that capacity, who assumed a corporate contract for his personal benefit, incurred a nondischargeable liability to the corporation by virtue of his misappropriation. In *In re Bernard*, 87 F.2d 705 (2d Cir.1937), the court similarly held that a corporate officer's liability for breach of duty to the corporation was nondischarge-

able. The Second Circuit found the corporate officer's defalcation within the contemplation of the framers of the Bankruptcy Act, even though an express trust imposed by contract or statute did not exist. *See also, In re Metz*, 6 F.2d 962 (2d Cir.1925).

The Fifth Circuit Court of Appeals applied § 17(a)(4) of the Bankruptcy Act, to an individual who, in his capacity as corporate officer and director, used his position to effectuate payment to corporate creditors holding his personal guarantee. Although unclear whether the Court relied on his status as an officer or as a director, it is clear that a traditional trust was not involved or required for the Court to make its finding of nondischargeability. *John P. McGuire and Company, Inc. v. Herzog*, 421 F.2d 419 (5th Cir.1970). This is equally clear in the case of *United Virginia Bank v. Fussell (In re Fussell)*, 15 B.R. 1016 (W.D.Va.1981), in which the debtor used his corporate position as officer and director to effectuate repayment of personal loans he had made to the corporation. This activity was in contravention of his subrogation agreement with the plaintiff.

More recently, the District Court in *Black's, Inc. v. Decker (In re Decker)*, 36 B.R. 452 (D.N.D.1983), held that the fiduciary relationship between corporate directors and the corporation falls within the scope of § 523(a)(4). The *Decker* Court recognized that the Supreme Court in *Aetna* did not mean to say that an officer of a corporation is not a fiduciary, but was merely addressing the application of the statute to implied trusts. This was also recognized by the court in *Kimmle v. Cramer (In re Cramer)*, 93 B.R. 764 (Bankr.M.D.Fla.1988), in which the court stated:

Such a narrow interpretation of this section would eliminate relationships which have traditionally been recognized to be fiduciary even though they are not created by an express or technical trust ... Clearly, Congress did not intend to exclude debts arising from a breach of the

---

**9.** Section 17(a)(4) of the Bankruptcy Act is the predecessor to Section 523(a)(4) of the Bankruptcy Code; therefore, cases decided under

that Section of the Act are applicable to Section 523(a)(4).

duty arising out of such relationships from the reach of § 523(a)(4) ... There is a fiduciary relationship which is inherent in certain relationships which by their very nature command and require the utmost trust and fair dealings between the parties even though they are not created by a technical or expressed trust. In some, the real test should be whether or not the fiduciary relationship existed from the very beginning or only came into being as a result of a commission of a wrong.

*See also, American Metals Corporation v. Cowley (In re Cowley)*, 35 B.R. 526 (Bankr. Kan.1983). *Accord, Moore v. Pagano (In re Pagano)*, 85 B.R. 56 (Bankr.S.D.Ohio 1988).

The Court believes that these cases illustrate the correct application of § 523(a)(4). The language of § 523(a)(4) is further supportive of this interpretation, in that the provision does not by its language restrict its scope to trusts or trustees but states, rather generically, that it applies to "fraud or defalcation while acting in a fiduciary capacity."

As observed by the court in *Bakis v. Snyder (In re Snyder)*, 101 B.R. 822, 835 (Bankr.Mass.1989), "the operative language in *Davis* for corporate directors [is] not the requirement of a technical trust, but the requirement that § 17(a)(4) only applies 'to a debt created by a person who is already a fiduciary when the debt was created.' 293 U.S. at 333, 55 S.Ct. at 154."

The next question is whether the Debtor committed "defalcation" within the meaning of § 523(a)(4).

 The term "defalcation" is quite broad, intended to include innocent or negli-

gent defaults in duty as well as intentional acts. It can be a mere deficit resulting from the Debtor's misconduct, even though he derived no personal gain. *Cowley*, 35 B.R. at 529; 3 *Collier on Bankruptcy* (15th ed. § 523.14[1][b] ). "Subjective intent to violate fiduciary duty is irrelevant in the determination of defalcation for dischargeability purposes; rather, an objective standard is used in determining whether defalcation has occurred." *Johnson*, 691 F.2d at 255; *Reliance Insurance Company v. Gagliano*, 44 B.R. 259, 261 (Bankr. N.D.Ill.1984); *NesSmith Electric Company, Inc. v. Kelley (In re Kelley)*, 84 B.R. 225 (Bankr.M.D.Fla.1988). Furthermore, reliance is not required for a determination of nondischargeability. *Gagliano*, 44 B.R. at 262. In an instance such as the case presently before the Court, failure to make full disclosure can constitute defalcation. *Decker*, 36 B.R. at 458. However, the Court is not satisfied that mere statements of opinion, without more, can constitute defalcation. *See*, e.g., *Mortgage Guaranty Insurance Corporation v. Pascucci (In re Pascucci)*, 90 B.R. 438 (Bankr.C.D.Calif. 1988); *Oppenheimer v. Reder (In re Reder)*, 60 B.R. 529 (Bankr.D.Minn.1986). With these principles in mind, the Court will now examine each of the subject transactions and the circumstances under which each was consummated.

**B.** *The Transactions*

i. *The Babbert Tract*

 In persuading Pan–Western to make its loan to J–5, Ltd., the Court is satisfied that defalcation, if not fraud, took place.[10] It is clear that Grier and the Debt-

---

**10.** The Debtor has suggested that since the loan by Pan–Western was not made to him or an affiliated entity, that it is not a proper subject for this litigation. The Debtor makes this assertion on the basis that the loan was made specifically to J–5 Limited. However, neither § 523(a)(2) nor § 523(a)(4) limit their scope to those liabilities grounded upon a loan or conveyance solely to the Debtor. In fact, the cases are legion which support the proposition that it is not necessary that property be actually procured for the Debtor himself. *See, In re Wade*, 43 B.R. 976 (Bankr.Colo.1984); *In re Gitelman*, 74 B.R. 492 (Bankr.S.D.Fla.1987); *In re Bom-*

*bard*, 59 B.R. 952 (Bankr.Mass.1986); *In re Sobel*, 37 B.R. 780 (Bankr.N.Y.1984); *In re Tom Woods Used Cars, Inc.*, 23 B.R. 563 (Bankr.Tenn. 1982). Although these cases were decided within the context of § 523(a)(2), the principle is equally applicable to § 523(a)(4), and the Court sees no logical basis for exclusion of the principle from § 523(a)(4). *See also In re Stephens*, 51 B.R. 591 (9th Cir.BAP 1985); *In re Weitzel*, 85 B.R. 753 (Bankr.N.D.Ohio 1988). There can be no doubt that the Debtor received benefit from this transaction in that he (a) was released from personal liability on the loan secured by the

or conjured the scheme whereby the Debtor would be relieved of a difficult situation in which he found himself with Pan–Western & Gardes Investment, and Grier would have no personal exposure. The Debtor deliberately and purposely led Pan–Western to believe that the sale price of the property was $220,000, that J–5 had made a cash downpayment of $10,000, and J–5 had executed a promissory note for $45,000 for the balance.[11] The Court is not convinced that the Debtor was candid with Pan–Western on this point. Numerous documents, including accounting records and tax returns, illustrate that the sale price of the property was in fact $165,000. Furthermore, the Debtor admitted that he made absolutely no effort to collect the promissory note purportedly executed by J–5 in connection with the sale.

Even if the purchase price was in actuality $220,000, the Debtor led Pan–Western to believe that J–5 would pursue development financing through HUD to develop the property as a low income housing project, knowing that HUD had placed a moratorium on financing low-income housing, that this property had already been viewed by HUD as an unacceptable site, and that HUD regulations prohibited HUD financing on a project in which Grier had an interest due to Grier's position with HUD. Under these circumstances, the Court cannot but find that the debt due Pan–Western is nondischargeable pursuant to § 523(a)(4).

When it became clear that a HUD project was not going to be constructed and that J–5 did not intend to pay the debt, the Debtor suggested that Pan–Western accept the deed in lieu of foreclosure. Defalcation by the Debtor again occurred as the Debtor induced Pan–Western to accept the deed with the assurances that the property was worth the amount due. Even if the Debtor believed this representation to Pan–Western, his fiduciary duty required him to have a rational basis for that conclusion by way of an appraisal or other substantiation of his valuation. There is no evidence that he did so, other than the grossly stale appraisal by Jean Littlejohn dated October 1, 1978. No conscientious real estate developer or lender would rely on an appraisal six years old, or seriously contend that it is reasonable to do so.

When Pan–Western acquiesced to the proposal, the Debtor obtained a deed in lieu of foreclosure and presented it to Pan–Western, but did not record it. There is a factual dispute whether the Debtor was to record the instrument or Pan–Western would accomplish this task. In either case, it certainly was in the best interests of Pan–Western to assure that it was accomplished, and the Debtor, as a director, had an obligation to insure that this was done. In light of Martin's reliance on the Debtor to accomplish all other tasks in connection with these real property transactions, it is only reasonable to infer that Pan–Western intended to rely on the Debtor to accomplish this as well. The Debtor's failure to insure that this task was completed, resulted in further damage to Pan–Western and constituted a breach of the Debtor's fiduciary duty.

The Debtor suggests that Pan–Western is precluded from prosecution of this Count of the Complaint by virtue of satisfaction of the debt. The Debtor contends that this occurred when Pan–Western accepted the deed in lieu of foreclosure and indicated satisfaction on the Note, Mortgage, and various other documents. This argument also misses the mark. Taken to its logical

Babbert Tract made by the Plaintiff in 1978, and (b) he received cash of approximately $50,000 with which he paid outstanding obligations due Gardes and/or Grier. The Court is compelled to ask how else would a Debtor be penalized for fraudulent conduct such as the kind presented by the facts of this case? Although the exceptions to discharge are to be narrowly construed, they are not to be so narrowly construed as to render a plaintiff in the position of Pan–Western without a remedy.

11. Even this was not accurate according to what is purportedly the Promissory Note executed by J–5. The Note is in the amount of $55,000. The logical conclusion of this is that J–5 made no cash investment into the property, a fact which undoubtedly would have been of significance to Pan–Western.

end, the Debtor's argument would prohibit an action for damages on fraud by any entity who had been fraudulently induced to accept a deed in satisfaction of a debt. This spurious argument defies logic and is not the law in today's bankruptcy or non-bankruptcy world. *See,* e.g., *Delaney v. Ohio Finance Co.,* 20 O.L.Abs. 112 (Ct. App.1935).

By virtue of the Debtor's transgressions, it is clear that the obligation owing to Pan–Western is nondischargeable pursuant to Section 523(a)(4). That liability is $165,-000 plus interest from November 15, 1982, less the value of the property as of April 19, 1984, the date that the Quit–Claim Deed was executed and delivered to Pan–Western.[12] The Court has no direct evidence establishing the value of this property as of April, 1984; however, based on the evidence presented, the Court finds the value of the property as of April, 1984 to be $67,250. This amount should be credited against the debt due Pan–Western as of April 19, 1984.

### ii. *Brandenberry Center*

■ In connection with the mortgage granted on October 28, 1983, Pan–Western complains that the Debtor failed to disclose certain things, and made other false representations. The Debtor has an explanation for every assertion by Pan–Western, which at first blush, appear to be quite plausible. However, in the final analysis, the Court cannot allow the Debtor to explain away each element of his conduct, especially in light of the years of experience that he has a real estate developer and promoter. This, coupled with the Debtor's fiduciary duties as director of the Plaintiff/Corporation, compels the Court to find this debt also nondischargeable.

First, Pan–Western asserts that the Debtor failed to disclose certain taxes due, and failed to pay delinquent taxes with a portion of the loan proceeds. The Debtor argues that he did disclose the taxes due, and failed to pay the taxes when "money ran out". Whether or not the disclosure was made is not really material at this point; what is significant is that the Debtor had an obligation to pay those taxes, as is customary when a transfer of property or interest in property takes place. This the Debtor failed to do, which violated his fiduciary duty to Pan–Western. Further, he had warranted that the taxes would be paid or would be current, when the mortgage was executed, which indicated that the property was subject to no encumbrances other than taxes which were not yet due and owing.

The Debtor also breached his duty when he failed to disclose the interest of Mr. Bahrick in the property. Mr. option to purchase, constituted an encumbrance on the property, as well as an indicia of its value. Notwithstanding, the mortgage did not reflect these interests adverse to Pan–Western. The Court is of the opinion that had Pan–Western been aware of the option of Bahrick to purchase the property for $330,000,[13] it would have been extremely

---

**12.** Although the Quit–Claim Deed was not recorded until December 11, 1984, Pan–Western had the Quit–Claim Deed as of the April date. The delay in recording was equally attributable to Pan–Western. Pan–Western had an obligation to mitigate its damages, and the Debtor should not be penalized for Pan–Western's failure to do so.

**13.** Bahrick's purchase price under the option was specified to be "a price equal to the mortgage balances which would be owed to Buckeye Federal Savings and Loan Association and Pan–Western Life Insurance Company as if all payments were made in accordance with [the] notes to said lenders ..., plus $48,000 cash." Recall that Bahrick loaned $48,000 when the agreements were executed. The figure of $330,-000 is based upon the Debtor's testimony that the encumbrances consisted of the Pan–Western mortgage in the amount of $190,000 and the Buckeye Mortgage of $140,000. The Debtor also insisted that an unsecured debenture due Pan–Western in the amount of $60,000 would be included in the calculation of the purchase price. The Court is satisfied that a debenture is not an encumbrance within the meaning of the Bahrick Agreement, but giving the Debtor the benefit of the doubt, this would increase the purchase price to only $390,000. The Debtor also insists that $48,000 would be included in the purchase price, but the Court finds this unlikely in light of the loan by Bahrick in the same amount. The promissory note was due in full on January 1, 1987, which is approximately the same date that the option to purchase would expire. However, even if this amount is included, the total purchase price remains less than

reluctant to grant a loan for $450,000 secured by a mortgage on the property.

The Debtor compounded the defalcation by failure to disclose the rent prepayment by Bahrick in the amount of $117,000, and the assignment of rents to Bahrick executed in January of 1981. Pan–Western had bargained for an assignment of rents which was included in its mortgage; however, this was valueless in light of the prepayment of rent by Bahrick and the assignment of rents to Bahrick already in place.

The mortgage also failed to note seven notices of lien by Ohio Bureau of Employment Security, which had been recorded in 1981 and early 1982, and the 1979 mechanic's lien filed by Ron Murphy Heating & Cooling. The Debtor asserts that he was unaware of these outstanding liens against the property; however, had the Debtor undertaken a title search or obtaining a title policy, which he should have done in light of his fiduciary responsibilities to Pan–Western, these encumbrances would have been discovered. The Court finds it difficult to believe that the Debtor was unaware of these items, but clearly a title search would have uncovered them. The Debtor counters that Pan–Western never requested a title insurance policy; however, again, the Debtor had an obligation to provide this title insurance by virtue of his relationship with Pan–Western. The Debtor knew or should have known that Pan–Western wanted a first mortgage on the property,[14] and this imposed on him an even greater obligation to assure that the interests of Pan–Western were protected.

Additionally, the Debtor provided Pan–Western with Dr. Leimbach's financial statement, with the knowledge that Pan–Western would rely partially on that financial statement. It is unclear whether Leimbach did or did not discuss the contents of the financial statement with the Debtor, but it is abundantly clear that the Debtor had a hand in its preparation. Whether the Debtor completed a blank document and tendered it as the financial statement, or collaborated with Leimbach in preparation of the statement, it is clear that the Debtor was extremely cavalier in the preparation of this statement and the representations to Pan–Western of Leimbach's net worth and the value of his life insurance policy. The Court is especially concerned with the life insurance policy of Dr. Leimbach, which was represented to Pan–Western to have a value of $200,000. This specifically was utilized by the Debtor to induce Pan–Western to make the loans. In light of this, and the fact that the policy was put forth as additional security for these loans, it was incumbent upon the Debtor to assure that the policy was of the value represented. This he did not do, and the policy was ultimately determined not to have the purported value. Such nonchalance which appears to be typical of the Debtor's performance throughout was in this chapter of this story a further violation of the Debtor's fiduciary responsibilities to Pan–Western.

Finally, much discussion was had regarding the size and value of the buildings in the Brandenberry Center. The Debtor urges that all representations centered around anticipated improvements to the property, which would enlarge the size of the buildings and thereby increase the value of the property. This was not borne out, however, by the closing statement prepared in connection with the loan. This was the only written document in connection with this transaction which contained information regarding the size and value of buildings on the property, but nowhere did it indicate that the dimensions and valuation were based on plans for future improvement or development. Rather, the statement simply gave the figures as if they were current, present day information. At the outset of this case, it was difficult for the Court to believe Pan–Western's allegations of the Debtor's represen-

the amount of the Pan–Western mortgage, and does not change the Court's view of this aspect of this case.

**14.** The Closing Agreement which the debtor signed expressly stated that Pan–Western was obtaining a first mortgage on the land and buildings.

tations of property values. Upon considering all of the transactions at issue, however, it became clear that the Debtor in fact made these representations, despite the Debtor's urging to the contrary. It was not by mere coincidence that the loans given by Pan–Western just happened to be approximately 74% of the purported values of the properties in every single instance. Thus, the Court is satisfied that the Debtor in fact represented that the present value of the property was $605,000. Without substantiation of that value, the Debtor's representation was a breach of his fiduciary duty under the circumstances of this case.[15]

### iii. *Oak Creek*

■ By the time that the parties were negotiating the Oak Creek transactions (i.e., the purchase of 2.201 acres to Pan–Western, Pan–Western's lease of the property to LG, and the loan by Pan–Western to LG) the Debtor had learned from previous transactions that Pan–Western was not approaching these transactions with him as ordinary arms-length business transactions. Rather, Pan–Western approached these deals casually, without undertaking any of the normal precautionary measures to protect its interests. Thus, the Debtor could tailor his representations, without regard to accuracy, to suit his purposes. This, in the Court's opinion, imposed an even greater burden and higher duty on the Debtor to deal fairly and honestly with Pan–Western. This he failed to do from several perspectives.

First, he failed to disclose real estate taxes outstanding at the time of the sale and the loan. Upon closing of each transaction, he failed to pay delinquent taxes from the proceeds of the transactions.

Even if the Debtor had disclosed the tax delinquency, as he contends, his failure to pay the taxes out of the proceeds constituted a second breach of fiduciary duty. He then represented in the mortgage document given to Pan–Western and the warranty deed given to Pan–Western that there were no tax liabilities outstanding except taxes "not yet due and owing". This was a third transgression of his duty. This failure to disclose and/or cure the tax problem is perhaps why he failed to procure and deliver the title insurance policy requested by Pan–Western in connection with the sale. Obviously, he would have had to pay the tax or the insurance policy would have disclosed the delinquency. Nevertheless, the failure to deliver the policy violated the fiduciary trust once again.

In connection with the sale of the 2.201 acres, the Debtor further represented that there was equity in the property sufficient to warrant the investment by Pan–Western in the property of $124,000. The Debtor made this representation in spite of the fact that there was no equity in the property by virtue of the mortgages held by Ohio Financial Service Corporation and Banc-Ohio National Bank. While the Court believes that generally a mere statement of opinion, standing alone, cannot constitute defalcation, the falsehood here is glaring. In light of the totality of the circumstances, including the reliance of Pan–Western, the Debtor's conduct was reprehensible.[16]

In connection with the loan, the Debtor assured Pan–Western that it would have a second mortgage to secure its interest, in spite of the fact that BancOhio held a third mortgage already in place. The Debtor attempted to exonerate himself, stating that, since Pan–Western was "absorbing its existing second mortgage, it would re-

---

**15.** Furthermore, no efforts were undertaken to accomplish these improvements. Now, this is not to say that inability to consummate development plans would constitute a breach of fiduciary duty, but in the present instance, the Debtor was sufficiently aware of his financial difficulties to know that future development would be difficult if not impossible. Nonetheless, he led Pan–Western to believe that these were his intentions, and this constituted a further breach of his fiduciary duties.

**16.** The Court is puzzled how the debtor in good conscience could cause transfer of the property on December 19, 1983 for $78,000, then cause the sale to Pan–Western on December 22, 1983 for $124,000. (See p. 897, *supra*). No explanation for this is provided by the record. This furthers Pan–Western's cause.

main in second place", notwithstanding the third mortgage of BancOhio. The Court is hard pressed to accept that the Debtor believed this to be true in light of his legal education and years of real estate experience. If that were the case, this is the kind of naive defalcation for which the Debtor must suffer the consequences.

As discussed above, the Debtor submitted Leimbach's financial statement and procured a collateral assignment of Leimbach's life insurance policy, for the purpose of inducing Pan–Western to make the loans without the investigation necessary to verify his representations or to protect Pan–Western's interests. This further exacerbates his transgressions.

Although there is no direct evidence in the record as to the financial status of the Galbreath entities, it is clear from the record that they were not meeting their various financial obligations to Pan–Western as they became due. Nor does it appear that LG was sufficiently solvent to meet these obligations. Under these circumstances, the Debtor knew or should have known that these loan obligations could not be met.[17] In the Court's opinion, the Debtor should never have requested the loan in light of the financial posture of LG and other Galbreath entities. Further, the property had been on the market for some time, with no prospects in sight. Therefore, the Debtor could not credibly expect an imminent sale of the property to meet the obligation to Pan–Western.

Given the totality of the circumstances, Pan–Western is entitled to a judgment of nondischargeability for the Debtor's defalcation in the amounts of: (a) $124,000 in connection with Pan–Western's purchase of the 2.201 acres; and (b) loan of $386,000.

Pan–Western has also urged the Court to hold the Judgment obtained by virtue of default under the lease to be nondischargeable. However, the evidence in the record is insufficient for the Court to find this debt nondischargeable pursuant to § 523(a)(4).

## C. Dischargeability Under Section 523(a)(2).

Pan–Western also insists that it is entitled to a judgment of nondischargeability pursuant to § 523(a)(2)(A) for false representations made by the Debtor in connection with the real estate transactions discussed above. Inasmuch as the Court has found these obligations nondischargeable pursuant to § 523(a)(4), it is not necessary to discuss the application of § 523(a)(2). However, the Court feels constrained to say that it is doubtful that Pan–Western could have prevailed under this theory.

■ Even if the Court could find that there is clear and convincing evidence that the material representations were made, the Court is unconvinced that Pan–Western relied on those representations. The Court is of the opinion that Pan–Western relied on its relationship with the Debtor as a director of the corporation and its prior relationship with the Debtor's father, Gerald Galbreath, Jr. The most glaring deficiency, however, is that of *reasonable* reliance. The creditor's reliance under § 523(a)(2)(A) must be reasonable. *Middletown City Emp. Fed. Credit Union v. Shepherd (In re Shepherd)*, 13 B.R. 367 (Bankr.S.D.Ohio 1981); *Mortgage Guar. Ins. Corp. v. Pascucci (In re Pascucci)*, 90 B.R. 438 (Bankr.C.D.Cal.1988); *Security Pacific Finance Corp. v. Grove (In re Grove)*, 73 B.R. 590 (Bankr.Minn.1987); *Armstrong Rubber Co. v. Anzman (In re Anzman)*, 73 B.R. 156 (Bankr.Colo.1986). *Accord, Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986). If one chooses to dabble in the business of real estate finance, one must be prepared to deal in accordance with the industry customs and dictates of prudence. In this instance, Pan–Western failed to insist on the most rudimentary procedures for financing or acquisition of real estate, such as title searches and binders, title insurance policies, opinion letters, appraisals, estoppel letters, financing statements, proper

---

**17.** Indeed, not a single principal payment was made on the note and only partial interest pay-

ments during 1984.

closing with formal closing statements, credit reports and the like. The fact that Pan–Western does not ordinarily engage in the business of real estate finance does not excuse it from the requirements imposed upon other lenders. Having failed to obtain the most basic protections, the Court could not find that Pan–Western acted reasonably. Therefore, Pan–Western could not have prevailed under § 523(a)(2).

### D. *Attorney's Fees and Costs*

In its Complaint, Pan–Western has requested a judgment for attorney's fees and costs in connection with this matter. Attorney fees and costs can be awarded only if provided for by statute or by contract. The Bankruptcy Code does not provide for allowance of attorney's fees and costs in connection with a dischargeability action except as provided in § 523(d). That section is expressly limited to consumer debts and therefore is not applicable to this case.

Although fees may be awarded by virtue of a contractual provision, *Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163 (6th Cir.1985), Pan–Western did not allege a contractual basis for such an award in its Complaint, nor did Pan–Western elicit such testimony at trial. Therefore, the request of Pan–Western for attorney's fees and costs is denied.

### IV. CONCLUSION

In accordance with the foregoing, the Court finds the obligation described in Count One of the Plaintiff's Complaint, represented by a Judgment obtained in the Court of Common Pleas of Franklin County should be declared nondischargeable. The Court further finds that judgment should be entered in favor of Pan–Western on Count Two of the Plaintiff's Complaint in the amount of $124,000, together with interest thereon at 10% from December 22, 1983 and that amount is nondischargeable pursuant to § 523(a)(4) of the Bankruptcy Code. The Court further finds that the Judgment which is the subject of Count Three of the Plaintiff's Complaint should be declared nondischargeable. The Court further finds that judgment should be en-

tered in favor of Pan–Western on Count IV of the Plaintiff's Complaint in the amount of $165,000, together with interest thereon at the rate of 10% from November 15, 1982, less the amount of $67,250 (representing the value of the Babbert Tract) which should be credited as of April 19, 1982 and that amount is nondischargeable pursuant to § 523(a)(4).

A separate final judgment will be entered in accordance with the foregoing.

IT IS SO ORDERED.