In re James B. JUDD and Patricia C. Judd, Debtors.

Earl W. POWELL, Plaintiff,

v.

James B. JUDD and Patricia C. Judd, Defendants.

Bankruptcy No. 93–22304–11.
Adversary No. 94–6035.

United States Bankruptcy Court, D. Kansas.

April 2, 1997.

Frank Wendt and Deborah R. Swank of Niewald, Waldeck & Brown, P.C., Kansas City, MO, for Plaintiff.

Gene A. Deleve and Samuel S. Ory of Berman, Deleve, Kuchan & Chapman, Kansas City, MO, for Debtor–Defendant James B. Judd.

## MEMORANDUM OPINION [1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

James B. Judd gave Chase Manhattan Bank, N.A., a $250,000 note guarantied by

1. Plaintiff Earl W. Powell appears by his attorneys, Frank Wendt and Deborah R. Swank of

his friend, Earl W. Powell. When Judd defaulted, Powell paid the note, honoring his guaranty and creating a right of reimbursement from Judd.[2] Under 11 U.S.C. § 523(a)(2)(B), such a claim will be excepted from discharge if Powell proves that he gave his guaranty in reasonable reliance on a false written statement of financial condition that Judd published with intent to deceive. Since Judd stipulated that he had given Powell a false balance sheet, Powell needed to prove only two elements to except his reimbursement claim from discharge. He needed to prove that he gave his guaranty by reasonably relying on Judd's balance sheet and that Judd issued it with intent to deceive. The Court finds that Powell proved Judd intended to deceive, but he failed to prove that in giving his guaranty, he actually or reasonably relied on the false balance sheet.

Powell's complaint contained six counts, four of which he dismissed, leaving Counts I and IV.[3] The previous paragraph of this opinion explained the gravamen of Count I. In Count IV, Powell charged that a liability different from the reimbursement claim should be excepted from discharge under § 523(a)(2)(B). That different liability is Judd's obligation on the note to Chase Manhattan Bank, N.A. Powell makes this charge as the noteholder, which he became by assignment from the bank when he honored his guaranty. At the close of plaintiff's evidence,[4] the Court dismissed Count IV, primarily because Powell failed to prove that the bank actually relied on Judd's balance sheet when it extended the loan, and secondarily because the Court questioned whether as a matter of law Powell could predicate a

nondischargeability action on the note he held by assignment.

## James B. Judd

When the events triggering this controversy occurred. James B. Judd, a Certified Public Accountant, was the managing partner of the profitable Kansas City, Missouri, office of the national accounting firm. KPMG Peat Marwick. He earned over $500,000 annually, allowing him to participate in various investments, including partnerships and Subchapter "S" corporations with real estate holdings, investments that eventually led to his downfall.

His descent began, for the purposes of this opinion, in May 1992 when the KANSAS CITY BUSINESS JOURNAL featured him in a front page article with a lead that read: "At a time when the integrity of the accounting profession has come under unprecedented attack, the managing partner of KPMG Peat Marwick's Kansas City office owes at least $2.5 million to one of the firm's audit clients."[5] The news story explained that in January 1992, the American Institute of Certified Public Accountants ("AICPA") announced a new "independence rule." With some exceptions, the new rule banned an audit client of a CPA firm (usually a bank) from granting an unsecured loan to a member of the firm. This rule impacted Judd because prior to 1986 he had borrowed from Merchants Bank of Kansas City, an audit client of Peat Marwick, to invest in 13 Kansas City real estate partnerships with two partners. One of his partners was Dane Brooksher, the managing partner of Peat Marwick's Chicago office and

---

Niewald, Waldeck & Brown, P.C., Kansas City, Missouri. Debtor-defendant James B. Judd appears by his attorneys, Gene A. DeLeve and Samuel S. Ory of Berman, DeLeve, Kuchan & Chapman, Kansas City, Missouri. Although the adversary proceeding caption shows Patricia C. Judd, James B. Judd's wife, as a defendant, she died during the case, and plaintiff has agreed not to substitute her estate in the proceeding.

2. The parties have stipulated that if a ruling of nondischargeability is entered, Powell shall have a money judgment for liability against Judd for the amount of the $250,000 claim. Presumably, this stipulation recognizes Judd's obligation as a principal to reimburse his guarantor, Powell, under the laws of the state of the contract.

3. The pretrial order recites: "The plaintiff, Earl W. Powell, orally moved to amend his complaint to voluntarily dismiss Counts II, III, V and VI. The defendants have no objection to such motion. Having heard the statements of counsel and the Court being fully informed, said motion was (sustained)." Final Pretrial Conference Order filed September 12, 1996, at 3.

4. The trial was held on November 20–22, 1996.

5. Defendant's Trial Exhibit I, Dan Margolies, *Peat Marwick partner owes $2.5 million to bank client*, KANSAS CITY BUSINESS JOURNAL, May 22–28, 1992, at 1.

Judd's immediate superior.[6] Judd's borrowing left him in potential conflict with the new AICPA pronouncement, unless he could replace any offending loan before July 1, 1992.

Meeting the deadline would have been less of a problem but for Judd's difficulties with Dane Brooksher. After the 1986 tax law changes eliminated passive loss deductions for real estate investments, Dane Brooksher refused to pay his share of the operating deficits of the partnerships, leaving those costs for Judd to pay. Unfortunately, Judd's available cash was limited by his pay structure with Peat Marwick. Although he earned over $500,000 per year, he was only paid an annual salary of $25,000 with a draw on July 15 of each year. This meant he needed additional cash during the year to meet expenses. Consequently, in addition to Merchants Bank, Judd borrowed money from Commerce Bank of Kansas City and Mercantile Bank of Kansas City. All three banks were audit customers of Peat Marwick. Thus, to avoid conflicts that could adversely affect his job, Judd needed to shift these loans to other lenders before July 1, 1992.

### Earl W. Powell

Judd's friend, Earl W. Powell, was a wealthy Miami, Florida, businessman and himself a former Certified Public Accountant. Powell was one of three owners of Trivest Service Corporation of Miami, Florida, and he served as the company's CEO. Trivest is apparently a venture capital company, for when asked what Trivest did, Powell replied: "We raise pools of capital from wealthy individuals and financial institutions and we invest that money in the equity of private companies that we control."[7] In 1990, Powell's annual compensation from Trivest was $3,732,500, and his net worth exceeded $17 million. He also held an interest in Bayshore Partners, an entity through which he developed a banking relationship with Chase Manhattan Bank of Florida, the lender that recommended the loan in this dispute, al-

though the loan was approved and made by an affiliated bank.

Before joining Trivest, Powell was a managing partner with Peat Marwick. He had managed the firm's Miami, Florida, office and had worked in its New York office. His tenure with Peat Marwick began in 1971 and lasted until he left the firm to enter private business in 1985.

Powell and Judd became acquainted at Peat Marwick and remained friends after Powell left the firm. Joined by their wives, the men met socially once or twice a year from 1985 to 1992. During that time, the Judds visited the Powells at their North Carolina vacation home and on one occasion in 1991 the couples cruised the Florida Keys in a boat Powell had rented. During the voyage, Patricia Judd confided to Powell that her husband was concerned about his investments with Dane Brooksher.

Because of his prior affiliation with Peat Marwick and his friendship with Judd, Powell knew some of Judd's financial circumstances before the transaction in dispute. Powell testified that he knew Judd was a "high unit" member of the Peat Marwick firm who earned in the neighborhood of half a million a year as the managing partner of the firm's Kansas City office. He knew Judd was investing in real estate partnerships with the managing partner of Peat Marwick's Chicago office, Dane Brooksher, a person well known to Powell who had himself invested with Brooksher in past years.[8] And from the conversation with Patricia Judd during the boat trip to the Florida Keys, Powell was aware of Judd's concern about his investments with Dane Brooksher. Also, Powell acknowledged as a former CPA that he was familiar with the AICPA rule change coming on July 1, 1992, and its possible effect on Judd's employment.

### Julie L. Neitzel

Julie L. Neitzel was a vice president of Chase Manhattan Bank of Florida, N.A., a

---

**6.** At some point the third partner withdrew from the partnership.

**7.** Testimony of Earl Powell contained in partial Transcript of Proceedings of hearing held on November 21–22, 1996, at 7.

**8.** Plaintiff's Exhibit 12, Powell's undated handwritten note, is some evidence that Powell knew Judd was participating in real estate investments.

loan production bank for Chase Manhattan Bank, N.A., of New York City. As a loan producer, the Florida bank processed and recommended loan applications to the New York bank. If the New York bank approved a particular recommendation, it usually made the loan in its own name, as it did in this instance.

Neitzel, an MBA, evaluated loans in the private banking department of the Florida bank. She was authorized to "recommend" loans of $1 million to $25 million to the New York bank. According to her testimony, a loan like Judd's for $250,000 was small for the private banking department and three days for processing it was not unusual.

Neitzel had known Earl Powell for six to nine months prior to this transaction through his interest in Bayshore Partners, a customer of her bank. In fact, even before this transaction she was actively "marketing" Powell with the hope of getting the Trivest, Inc., loan business for the bank.

### Douglas A. Rettew

Douglas A. Rettew was Julie Neitzel's immediate superior at Chase Manhattan Bank of Florida, N.A. Although he was mentioned frequently in the testimony and apparently played a significant role in the transaction, he did not testify.

### Gary Glick

Gary Glick was the person at Chase Manhattan Bank, N.A., of New York City with authority to approve loans recommended by Douglas Rettew and Julie Neitzel. He approved Judd's loan on the recommendation of Rettew and Neitzel and transmitted his approval by fax from New York.

9. According to the testimony, the Mercantile Bank loan also needed to be replaced, but the immediate problem when Judd spoke to Powell was the Commerce Bank loan. Apparently, some other solution for the Mercantile note had been worked out by the time Judd requested a loan from Powell.

10. Deposition of Earl Wayne Powell taken on January 19, 1995, at 43.

11. Plaintiff's Exhibits 11 and 11A at 1. *See also* Plaintiff's Exhibit 30.

## The Transaction

### The Telephone Call

Sometime during the week of June 15, 1992, James Judd telephoned Earl Powell in Miami and asked him for a $300,000 loan. Judd explained that the new AICPA rule threatened to create a problem with his job, a problem he was desperate to avoid. Powell knew about the new independence rule and understood that Judd needed to replace his note with firm customer Commerce Bank of Kansas City before the July 1, 1992, effective date of the new rule.[9] According to Powell's portrayal, Judd was "on his knees"[10] because of his urgent need to obtain a different lender and the apparent lack of a willing candidate.

Nevertheless, Powell refused Judd's request for a loan. He did, however, volunteer to approach his banking connections on Judd's behalf. To expedite that process, he asked Judd for financial information suitable to pass on to any lender who might be willing to make a loan.

### The Judd Memo and Balance Sheet

At the end of the week of June 15, 1992, Judd responded to Powell's request for financial information with a handwritten memo on Peat Marwick stationery stating: "Earl, Hope this is the info you wanted. I'll call on Monday. *Many, Many,* Thanx."[11]

The first sheet attached to the memo is the "James B. Judd Balance Sheet July 1, 1991," a balance sheet that Judd gave to Boatmen's First National Bank of Kansas City, N.A., when he applied for a loan in 1991.[12] The remaining attached sheets provided cash flow information and support for various balance sheet items.[13]

12. Plaintiff's Exhibit 11 and 11A at 2, Appendix A, hereto. *See also* Plaintiff's Exhibit 30 and Defendant's Exhibit H.

13. The memo, balance sheet, and supporting financial information can be found in two trial exhibits in evidence—Plaintiff's Exhibit 11 and 11A. With the exception of Powell's handwritten notes on Exhibit 11A, the exhibits are identical. Exhibit 11 was produced during discovery from the records of Chase Manhattan Bank of Florida. Exhibit 11A came from Powell's office records and was produced and offered as evidence at trial without prior disclosure to Judd's attorneys. Although it contained some minor handwritten

The item of interest in the balance sheet is an asset representing Judd's holdings of interests in partnerships and corporations labeled:

> Various General Partnerships and
> Subchapter 'S' Corporations—
> Oil & Gas, Real Estate—Ltd.
> Partnerships, General Part-
> nerships and Other          $280,000 [14]

Although this item reflects a $280,000 value for the various interests, the supporting information attached to Judd's memo fails to explain the number's composition. For this explanation, another document is required, a document Judd neglected to include with his handwritten memo.

## The Powell Notations

While the exact date Powell received Judd's memo, the attached balance sheet and other financial information is not established, Powell's secretary, Linda Baker, forwarded it to Douglas Rettew on Tuesday, June 23, 1992. Her desk memo to Rettew states: "The attached is from Earl Powell. He asks if you would give him a call when you receive this. 858–2200. Thank you. LB." [15] Powell testified that when he received Judd's balance sheet, he reviewed it and wrote figures on it about the drawing and capital accounts. His notes on the balance sheet confirm that testimony.[16] He also testified that after making his notations, he forwarded the financial information to Julie Neitzel. Powell was correct about the financial information being forwarded after he made notes on it, but he was mistaken about sending it to Neitzel. Baker's note proves she sent the information to Rettew, not to Neitzel, on Tuesday, June 23, 1992.

Judd testified that he did not ask Powell to guaranty the note. The evidence on how Powell came to guaranty Judd's loan is sparse and, to the extent it exists, conflicting. Powell testified he talked directly to Neitzel to arrange the loan and that the financial information was sent to Neitzel, not Rettew.

Linda Baker's message indicates she forwarded the financial information to Douglas Rettew rather than to Julie Neitzel. Powell does not recall talking to Rettew about a loan for Judd. On the other hand, Neitzel says that Powell had talked to Rettew about the loan before she became involved and that, in turn, Rettew directed her to evaluate and document the loan based on Powell's guaranty secured by marketable bonds.

Although Powell says he relied on Judd's balance sheet in giving the guaranty, he does not explain how he came to make the guaranty. He simply says he gave it in reliance on Judd's balance sheet and cash flow information. He suggests that the bank, acting through Neitzel, required the guaranty, but he does not relate any conversations with her in which she asked for the guaranty and he agreed to give it. Since Douglas Rettew was not called as a witness to clarify his role, there is no direct evidence on exactly how the guaranty came about. However, in light of Linda Baker's desk memo to Rettew asking him to call Powell, the Court accepts Neitzel's testimony over that of Powell's and concludes that, contrary to his recollection, Powell worked matters out with Rettew. Most probably Rettew and Powell discussed the loan terms, including the secured guaranty, and Powell agreed to those terms. Rettew in turn alerted Neitzel that financial information would be forthcoming and that Powell had agreed to back his guaranty with his marketable bonds.

## The List of Investments

There was considerable testimony about whether or not Judd delivered a list of his investments to Powell, a list important to anyone evaluating Judd's balance sheet because it explained the composition of the $280,000 value for partnership and Subchapter "S" corporation interests. The list is captioned: "James B. Judd, Investments in Partnerships and Subchapter 'S' Corporations, July 1, 1991." [17] If Judd actually failed

notes not appearing on Exhibit 11, the Court admitted Exhibit 11A over Judd's objection.

**14.** Plaintiff's Exhibit 11 and 11A at 2.

**15.** Plaintiff's Exhibit 1, a transmittal from Linda E. Baker, Powell's secretary, to Douglas Rettew, Julie Neitzel's superior at the Florida bank.

**16.** Plaintiff's Exhibit 11A.

**17.** Plaintiff's Exhibit 30 at 2, Appendix B hereto.

to send this document to Powell with the memo, Powell would have been less likely to learn that the $280,000 figure was misleading when he reviewed the balance sheet. The list names and values 11 parcels of real property and oil and gas interests Judd held. While the bottom line value, $280,000, on this sheet is the same as that shown on the balance sheet, the details reveal debt undisclosed on the balance sheet. On this document the total value of all property interests is shown as $830,000, before deducting outstanding debt on all the properties. Then, a negative number next to an item called "Investment in Real Estate General Partnerships (Net of Related Debt)" totaling $550,-000 is deducted from the $830,000, resulting in the $280,000 amount shown on the balance sheet as "Various General Partnerships and Subchapter 'S' Corporations—Oil & Gas, Real Estate—Ltd. Partnerships, General Partnerships and Other." Anyone looking at the balance sheet with the benefit of the investment list numbers would conclude that the $280,000 figure was misleading. Powell claims to have been deceived because Judd did not give him the investment list showing the $550,000 negative number. While Judd testified that he "thinks" he furnished Powell with the list, it was not among the financial documents attached to his memo to Powell.[18] Therefore, the Court concludes that Judd failed to send Powell the real estate investment breakdown revealing significant debt not shown on the balance sheet.

## The Credit Approval Memo

When Neitzel received the balance sheet and supporting financial documents, she began her customary procedure of collecting information on Judd for a Credit Approval Memo ("CAM"). Although she says Rettew had talked to Powell about the loan before she became involved, she discussed the loan and guaranty by telephone with Powell, probably on June 23. She requested and obtained a Credit Profile on Judd on June 24, 1992.[19] Between June 23 and June 26, she examined Judd's balance sheet and support-

ing documents and asked him by telephone for additional information. However, she neither asked Judd about his real estate investments, nor found out about them from Judd, although she knew about them from looking at the balance sheet.

Based on her study, Neitzel reported in the Credit Approval Memo that Judd was leveraged and illiquid and that he could not fully amortize the proposed loan unless he liquidated personal assets or obtained alternative lines of credit to replace the bank's one-year term loan and that the loan should not be made without Powell's secured guaranty.[20]

In her testimony Neitzel frankly admitted that she was marketing Powell and Trivest, Inc.; that she knew Judd could not amortize the loan with his cash flow; and that Judd told her he would pay it by getting another loan. Although she knew Judd would get a distribution from his firm in July of 1992 and probably again in 1993 if he kept his job, she confirmed she would not have considered him for an unsecured loan.

## The Recommendation

On June 25, Neitzel and Rettew recommended to Gary Glick in New York that the loan backed by Powell's secured guaranty should be approved. The recommendation was faxed to Glick,[21] who in turn approved it with his initials and returned it to Neitzel by fax at 11:38 on June 26 with this notation:

> I assume we have advised Earl Powell that he or his collateral may be the ultimate source of payback for loan. GWG. [Approval by Glick.][22]

According to Neitzel, she did inform Powell of his probable ultimate responsibility for the debt as Glick suggested.

## The Loan

Neitzel wrote Judd on Friday, June 26, outlining the bank's offer of a term loan of $250,000, and enclosed the promissory note for the signatures of Judd and his wife, Pa-

---

**18.** Plaintiff's Exhibit 11A.

**19.** Plaintiff's Exhibit 2.

**20.** Plaintiff's Exhibit 3.

**21.** Plaintiff's Exhibit 3.

**22.** Plaintiff's Exhibit 3.

tricia.[23] Both Neitzel's letter and the promissory note called for Powell's secured guaranty as a condition of the loan. There is no doubt that when Judd signed the promissory note dated June 30, 1992, he knew that Powell was guaranteeing it, albeit according to the testimony, Judd did not ask Powell for the guaranty.

Not only did Judd sign the note, but without consulting his wife, he also signed her name to the note before returning it to Neitzel on June 29.[24] At Neitzel's written direction, Connie Shu, a bank employee, distributed the loan proceeds to Judd on June 30, the day before the AICPA deadline.[25] Ultimately, Neitzel caused Powell's guaranty to become a part of the Bayshore Partners loan file at Chase Manhattan Bank of Florida.

### Aftermath: Stipulations

#### The Default

When Judd defaulted on the note due July 15, 1993, Powell paid his guaranty and received an assignment[26] of Judd's note from Chase Manhattan marked canceled.[27] Judd filed a petition under Chapter 11 of the Bankruptcy Code on March 29, 1994. His schedules listed Powell's claim, his plan of reorganization included it; and ultimately, after confirmation, the plan distributed a partial payment on the claim.

#### The Early Retirement

Sometime after the transaction, Peat Marwick installed a new management team that initiated a program requiring all firm partners to serve as engagement partners. An engagement partner, in contrast to a managing partner, works directly with firm clients on their specific accounting problems. Having been a managing partner for many years, Judd was no longer qualified to be an engagement partner. Consequently, he was forced into early retirement. However, he was able to negotiate a $250,000 retirement package from Peat Marwick, a remuneration he used to fund his Chapter 11 plan of reorganization.

#### The Investigation

During the pendency of Judd's bankruptcy case, the United States Attorney's office initiated a criminal investigation focusing on Judd's conduct in obtaining a $250,000 loan from Boatmen's Bank of Kansas City in July 1991. As a result, Judd entered a Plea Agreement on May 13, 1996, under which he pleaded guilty to a one-count Information charging him with making a false statement to a federally insured financial institution.[28] In his plea, Judd admitted using a materially false financial statement dated July 1, 1991, which consisted of the balance sheet he had given to Boatmen's Bank in July 1991. This was the same balance sheet he gave to the Chase banks in June 1992.

In addition, Judd pleaded guilty to having made a false statement by signing his wife's name to the promissory note to Chase Manhattan Bank, N.A.[29]

#### The Stipulations

In light of his criminal plea, Judd stipulated in this case that the balance sheet he gave Earl Powell and Chase Manhattan Bank was materially false.

#### The Decision: Intent to Deceive

The question of intent to deceive is a factual one, a question to be answered by the totality of the evidentiary circumstances, including the recklessness of a debtor's behavior.[30] One evidentiary circumstance is Judd's admission that he issued a materially false balance sheet. A second circumstance is his failure to furnish Powell with the list of investments revealing substantial debt not reflected on the $280,000 balance sheet value. Both circumstances may have prevented Powell from detecting the truth about the

---

23. Plaintiff's Exhibit 4.

24. Plaintiff's Exhibits 5 and 6.

25. Plaintiff's Exhibit 7.

26. Plaintiff's Exhibit 24.

27. Plaintiff's Exhibit 23.

28. Plaintiff's Exhibits 68 and 69, respectively.

29. Final Pretrial Conference Order filed September 12, 1996, paragraph E at 4.

30. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir.1994).

balance sheet. Judd's failure to disclose the investment list was, at best, reckless conduct; at worst, it was an intentional act of deception by a CPA. In combination, the issuance of the false balance sheet with the withholding of the investment list are circumstances that cause the Court to conclude that Judd issued the balance sheet with intent to deceive.

## The Decision: Reliance

### The Independent Element of Reliance

■ To support a finding of nondischargeability, § 523 makes reasonable reliance an independent element of proof.[31] Necessarily, the concept of reasonable reliance must be divided into two components: (1) actual reliance, and if it is found to exist, (2) the reasonableness of the actual reliance.

### Dismissal of Count IV

■ As with intent to deceive, actual reliance is a question of fact to be determined from all the circumstances. At the close of plaintiff's evidence, the Court dismissed Count IV because Chase Manhattan Bank N.A. of Florida and its affiliate made the loan to Judd relying on Powell's guaranty and collateral, not on Judd's false balance sheet, as the Credit Approval Memo proves:

> We recognize that the Borrowers are fairly leveraged and illiquid. However, we feel that the Guarantor and the proposed collateral provides [sic] adequate support to offset the weak balance sheet of the Borrowers.[32]

The Credit Approval Memo further reflects Neitzel's motivation to gain Powell and his company, Trivest Service Corporation, as a bank customer:

> While the Judds may be a USPB prospect when more liquification of assets occur

[sic] and personal debt is reduced, our primary focus is to further market Earl Powell.[33]

■ Finally, Glick's statement upon approval of the loan cements the bank's reliance on Powell's secured guaranty as the reason for granting the loan. In approving the loan, Glick clearly knew collection from Judd was of no interest to the bank. If the bank could not successfully prosecute an exception from discharge for its claim because it took the note without relying on a false balance sheet, neither could an assignee of the note.

Furthermore, even if Chase Manhattan had relied on the false balance sheet, the question remains whether Powell, the guarantor, could step into the bank's shoes as payee of the note for the purpose of prosecuting a discharge exception in the maker's later bankruptcy,[34] especially where, as here, the payee canceled the note before assigning it to the guarantor.[35] Fortunately, the Court need not solve this conundrum since Chase Manhattan did not rely on Judd's false balance sheet, but rather upon Powell's secured guaranty. The Court concludes that Powell's only claim for purposes of nondischargeability derives from his right of reimbursement from Judd for having satisfied the note under his guaranty, not from the canceled note he holds by assignment. Therefore, to successfully except his reimbursement claim from discharge, Powell must prove that he gave his guaranty in actual reliance on Judd's false balance sheet.

### The Lack of Actual Reliance

■ Although Powell claims the false balance sheet induced him to give his guaranty, he has failed to say when, why, or under what circumstances he decided to give the guaranty. When Judd asked him for a loan, Powell declined without explanation and vol-

---

31. *First Bank of Colorado Springs v. Mullet (In re Mullet)*, 817 F.2d 677, 680 (10th Cir.1987) (holding that all elements of **§ 523(a)(2)(B)** must be independently proven and debtor's dishonesty will not soften that requirement for the element of reliance).

32. Plaintiff's Exhibit 3, Credit Approval Memo, at 3.

33. *Id.* at 5.

34. *Mortgage Guar. Ins. Corp. v. Pascucci (In re Pascucci)*, 90 B.R. 438, 447 (Bankr.C.D.Cal. 1988) (holding an insurer's subrogation claim could not be held nondischargeable based on a false financial statement provided to indemnitee).

35. Plaintiff's Exhibit 23.

unteered to solicit his banking contacts on Judd's behalf, asking Judd to forward financial information to assist him. When Powell received the financial information, he examined the balance sheet and noted some comments on it about the capital and drawing accounts. Did he form the intent at this time to give his guaranty if a bank should require it as a condition of a loan to Judd? He does not say, leaving the Court to speculate. He had already declined Judd's loan request and the evidence is clear that the two of them never discussed a guaranty. Therefore, Powell's examination of Judd's balance sheet could have just as likely been a means of informing himself about Judd's financial condition for discussions with his banking connections as it could have been a basis for guarantying any forthcoming loan for Judd. Eventually, Powell decided to guaranty Judd's loan either as a volunteer or at the bank's request, but he has not explained when he made that decision. He denied talking with Rettew about the loan or about giving a guaranty. He presented no specific conversation with any bank employee in which he agreed to give the guaranty and put up collateral in the form of his marketable bonds. On this state of the record, the Court can only conclude that Powell failed to prove by a preponderance of evidence any actual reliance on Judd's false balance sheet.

**The Reasonableness of Reliance**

In addition to being actual, reliance must also be reasonable under § 523(a)(2)(B). A person who extends credit cannot do so imprudently or recklessly and expect to except his claim from discharge. Reasonable reliance is to be determined by the standard of what a reasonably prudent person would do under the same or similar circumstances.[36]

The Court cannot determine from the evidence whether Powell volunteered his guaranty to Chase Manhattan to get Judd a loan or whether the bank required it as a condition of making the loan. Suppose, contrary to the Court's prior finding, that he did volunteer his guaranty and that he actually relied on the false balance sheet in deciding to do so. Was this action that of a reasonably prudent creditor? Should Powell have investigated further under the circumstances? He was no novice at finance. He was a former CPA and the CEO of Trivest, a company that paid him almost $4 million in 1990, a company he said "raise[s] pools of capital from wealthy individuals and ... invest[s] that money in the equity of private companies that we [Trivest] control."[37] He knew he was examining a balance sheet that was almost a year old, a balance sheet that a prudent lender would certainly question for that reason alone. Especially questionable is the mortgaged real estate that is subject to the vicissitudes of local changes and · that presents the possibilities a reasonable lender would want current information about. He knew that Judd was involved in real estate investments with Dane Brooksher, an acquaintance of Powell's with whom he himself had invested before, and Powell knew from his conversation with Mrs. Judd during their boat trip in 1991 that James Judd was distressed about those investments. Finally, Powell knew Judd was desperate for a loan, desperate enough that Powell himself characterized Judd as being "on his knees." A telephone call to Brooksher would have yielded information about the investments, but apparently no such call was made. A telephone call to any Big Six accounting firm in Kansas City would have revealed the $2.5 million real estate debt attributed to Judd in the KANSAS CITY BUSINESS JOURNAL article. That information was common knowledge in the Kansas City business community.

Another circumstance bearing on Powell's reasonable reliance is the Court's finding that he never saw the list of investments that revealed the make-up of the $280,000 real

---

**36.** The standard for reliance in fact and for determining reasonable reliance is what a reasonable person would do under similar circumstances. *See Field v. Mans,* — U.S. —, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (recognizing the reasonableness standard applicable under § 523(a)(2)(B) while holding the justifiable reliance standard to be applicable under § 523(a)(2)(A) and stating that the reasonable person test entails a duty to investigate).

**37.** Transcript of proceedings held November 21 and 22, 1997, at 7.

estate asset on the balance sheet. If he relied on the balance sheet without having seen the investment list, he would easily have concluded that this asset was available as security for his guaranty. But he never asked for a lien on the $280,000 item. Rather he pledged marketable securities as collateral for his guaranty and left his potential reimbursement claim unsecured in the event of Judd's default. And it is no answer for Powell to say that he reasonably relied on Judd's earnings to pay off the Chase Manhattan loan, since the reason Judd needed the loan was to protect those earnings. This fact should also have made Powell wary of giving a guaranty backed by his bonds but not secured by any of Powell's property.

If on the other hand Powell was not a volunteer and the bank asked him for his guaranty as a condition to the loan, he must be credited with knowing that the bank had looked deeply enough at Judd's financial condition to conclude that it was imprudent to lend to him, even with his alleged $280,000 real estate equity as security. The evidence does not show when Powell agreed to give his guaranty in relation to when the bank concluded that Judd was not creditworthy. At some point Powell must have become aware that, without his secured guaranty, the bank would not lend to Judd. These circumstances prevent Powell from saying that he reasonably relied on the balance sheet when he knew or should have known that the bank was unwilling to give either secured or unsecured credit based upon it! Knowing the bank wanted a guaranty secured by his bonds, he gave it without getting similar security from Judd, his principal, although the balance sheet showed Judd had a $280,000 equity in real estate investments. If Neitzel delivered Glick's warning as she testified, Powell was imprudent, indeed reckless, to guaranty the loan without collateral from Judd. Whether Powell volunteered his guaranty or gave it at the bank's request, if he is assumed to have actually relied on Judd's balance sheet, the Court concludes he was not acting as a reasonably prudent creditor under the circumstances.

**Conclusion**

For the reasons stated, the Court finds that Powell has failed to prove by a preponderance of the evidence that he actually or reasonably relied on the false balance sheet when he gave his guaranty to Chase Manhattan Bank on Judd's behalf. Consequently, the Court denies Count I in which Powell sought to except the debt from discharge under § 523(a)(2)(B).

At the close of plaintiff's evidence, the Court dismissed Count IV, primarily because Powell failed to prove that the bank actually relied on Judd's balance sheet when it extended the loan, and secondarily because the Court questioned whether as a matter of law Powell could predicate a nondischargeability action on the note he held by assignment. This opinion shall serve as additional findings of fact and conclusions of law to support the Court's prior oral ruling made on the record at the end of plaintiff's evidence.

Powell voluntarily dismissed the remaining counts of the Complaint.

The foregoing discussion shall constitute findings of fact and conclusions of law under **Fed.R.Bankr.P. 7052** and **Fed.R.Civ.P. 52(a)**.

The parties have stipulated in the Final Pretrial Conference Order that the Court has jurisdiction over the parties and subject matter of the action; that venue in this district is proper; that all necessary and indispensable parties are joined; and that the Court may try this adversary proceeding to final judgment. Further, the parties, by the plaintiff's complaint and the defendants' separate answers, admit this is a core proceeding under **28 U.S.C. § 157(b)(2)(I)** under **Title 11.** The Court finds that this proceeding is core under **28 U.S.C. § 157** and that the Court has jurisdiction under **28 U.S.C. § 1334** and the general reference order of the District Court effective July 10, 1984 (**D.Kan. Rule 83.8.5**).

IT IS SO ORDERED.

# APPENDIX A

JAMES B. JUDD
Balance Sheet
July 1, 1991

### ASSETS

| | | |
|---|---|---|
| Cash | | $ 17,945 |
| Marketable Securities, At Market | | 9,465 |
| KPMG Peat Marwick: | | |
| Capital & Drawing Accounts | | 762,000 |
| Personal Retirement Account | | 470,178 |
| Vested Portion of Pension | | 859,230 |
| Fund, Net of estimated tax ✓ | | |
| Deferred Revenue Accounts | | |
| (401-K & IRA) | | 232,459 |
| Various General Partnerships and | | |
| Subchapter "S" Corporations - | | |
| Oil & Gas, Real Estate - Ltd. | | |
| Partnershipss, General Part- | | |
| nerships and Other | | 280,000 |
| Real Estate - 6331 Ensley Lane | | |
| (Home) Net of Mortgages of $611,750 ✓ | | 138,250 |
| Automobiles - Three | | 40,000 |
| Personal Property, Primarily | | |
| Jewelry and Art (Appraised | | |
| Value $237,939) | | 200,000 |
| Total Assets | | $3,009,527 |

### LIABILITIES

| | | |
|---|---|---|
| Accounts Payable | | $ 5,000 |
| Notes Payable to Bank | | 875,000 |
| Income Taxes Payable - 1991 | | - (1) |
| Total Liabilities | | $ 900,000 |
| | | |
| Net Worth | | $2,109,527 |
| | | |
| Total Liabilities and Net Worth | | $3,009,527 |

| | | |
|---|---|---|
| Income (For Year Ended June 30,1991): | | |
| KPMG Peat Marwick (Estimated) | $ 556,000 | |
| Oil & Gas, Real Estate and Other | 60,000 | |
| | $ 616,000 | |

| | | |
|---|---|---|
| Life Insurance: | | |
| AICPA (Prudential Group Term) * | 500,000 | |
| KPMG Peat Marwick (Prudential Group | $3,500,000 | |
| Term) * * | | |
| | $4,000,000 | |

*Beneficiary - Patricia C. Judd - Wife
**Beneficiaries are my wife ($2,750,000) and my daughter ($750,000)
(1) It appears that I am in an overpaid position with regard to income taxes. However, I will not have an exact amount until the return is prepared in August.

2

APPENDIX B

## JAMES B. JUDD

Investments in Partnerships and
Subchapter "S" Corporations
July 1, 1991

| | |
|---|---|
| Presidential Associates (Real Estate - Winthrop Apartment Project in Chicago - Limited Partnership) | $ 50,000 |
| BHJ Ventures (Real Estate - Oil & Gas and a Limited Partnership in Baltimore, Maryland | 50,000 |
| B H J & M Ventures (Oil & Gas) | 5,000 |
| BOCA Associates (Oil & Gas) Merged w/Raton Associates in 1990 | 25,000 |
| Anadarko (Oil & Gas) | 50,000 |
| Abington Oxford (Real Estate - Limited Partnership - (Section 8 Apartments in Indianapolis, Indiana) | 40,000 |
| Smackover Associates, Inc. (Oil and Gas) | 375,000 |
| Judmor Associates, Inc. (Oil & Gas) | 200,000 |
| B Sher Associates, Inc. (Oil) | 20,000 |
| Aquarius Energy Corporation (Oil - Net of Approx. $3,000 Debt) | 10,000 |
| Investment in Real Estate General Partnerships (Net of Related Debt) | (550,000) |
| Marketing Travel, Inc. (Common Stock - Closely Held Corporation) | 5,000 |
| | $280,000 |

**100004**